1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name ____RUIZ,_____WILLIAM_____
         (Last)            (First)              (Initial)

3  Prisoner Number ____C-62255_____

4  Institutional Address ____CTF-Central, California State Prison at Soledad___

5  ____P.O. Box 689, 93960-0689_____

6

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  ____WILLIAM RUIZ_____        )
   (Enter the full name of plaintiff in this action.)   )

9                                              )
                                               )   Case No. _____
10  ____BEN CURRY, Warden_____        )
                                               )   (To be provided by the clerk of court)
11  _____       )
                                               )   **PETITION FOR A WRIT**
12  _____       )   **OF HABEAS CORPUS**
                                               )   Evidentiary hearing requested
13  _____       )
                                               )
14  (Enter the full name of respondent(s) or jailer in this action)  )

15

16  _____Read Comments Carefully Before Filling In_____

17  **When and Where to File**

18      You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1    <u>Who to Name as Respondent</u>

2    You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6    If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10    <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11    1. What sentence are you challenging in this petition?

12    (a)    Name and location of court that imposed sentence (for example; Alameda

13    County Superior Court, Oakland):

14    <u>Superior Court of Tulare County, Tulare, CA</u>

15    Court                                    Location

16    (b)    Case number, if known ___<u>21376</u>___

17    (c)    Date and terms of sentence ___<u>3-29-83 (15 years to life)</u>___

18    (d)    Are you now in custody serving this term? (Custody means being in jail, on

19    parole or probation, etc.)         Yes __<u>X</u>__    No _____

20    Where?

21    Name of Institution: <u>CTf-central, Soledad, CA</u>

22    Address: <u>Hgy 101 North, Soledad, California</u>

23    2. For what crime were you given this sentence? (If your petition challenges a sentence for

24    more than one crime, list each crime separately using Penal Code numbers if known. If you are

25    challenging more than one sentence, you should file a different petition for each sentence.)

26    <u>Second degree murder under P.C. §187</u>

27    _____

28    _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?                Documentation unavailable at this time

    Arraignment:                                Yes \_\_\_\_\_     No \_\_\_\_\_

    Preliminary Hearing:                        Yes \_\_\_\_\_     No \_\_\_\_\_

    Motion to Suppress:                         Yes \_\_\_\_\_     No \_\_\_\_\_

4. How did you plead?

    Guilty \_\_X\_\_     Not Guilty \_\_\_\_\_     Nolo Contendere \_\_\_\_\_

    Any other plea (specify) _____None_____

5. If you went to trial, what kind of trial did you have?     Not available

    Jury \_\_\_\_\_     Judge alone \_\_\_\_\_     Judge alone on a transcript \_\_\_\_\_

6. Did you testify at your trial?                        Yes \_\_\_\_\_     No \_\_\_\_\_

7. Did you have an attorney at the following proceedings:     Not available

    (a)     Arraignment                          Yes \_\_\_\_\_     No \_\_\_\_\_

    (b)     Preliminary hearing                   Yes \_\_\_\_\_     No \_\_\_\_\_

    (c)     Time of plea                          Yes \_\_\_\_\_     No \_\_\_\_\_

    (d)     Trial                                Yes \_\_\_\_\_     No \_\_\_\_\_

    (e)     Sentencing                           Yes \_\_\_\_\_     No \_\_\_\_\_

    (f)     Appeal                               Yes \_\_\_\_\_     No \_\_\_\_\_

    (g)     Other post-conviction proceeding      Yes \_\_\_\_\_     No \_\_\_\_\_

8. Did you appeal your conviction?                       Yes \_\_x\_\_     No \_\_\_\_\_

    (a)     If you did, to what court(s) did you appeal?

Information unavailable at this time     Court of Appeal     Yes \_\_\_\_\_     No \_\_\_\_\_

    Year: _____     Result:_____

    Supreme Court of California     Yes \_\_\_\_\_     No \_\_\_\_\_

    Year: _____     Result:_____

    Any other court     Yes \_\_\_\_\_     No \_\_\_\_\_

    Year: _____     Result:_____

    (b)     If you appealed, were the grounds the same as those that you are raising in this

Does not apply to this cause of action

PET. FOR WRIT OF HAB. CORPUS          - 3 -

1           petition?                       Yes _____    No_____

2       (c)    Was there an opinion?       Yes _____    No_____

3       (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                        Yes _____    No_____

5           If you did, give the name of the court and the result:

6           _____

7           _____

8  9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9  this conviction in any court, state or federal?        Yes _____    No _x_

10       [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition. You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15  U.S.C. §§ 2244(b).]

16     (a)    If you sought relief in any proceeding other than an appeal, answer the following

17           questions for each proceeding. Attach extra paper if you need more space.

18       I.    Name of Court: ___Superior Court of Tulare County___

19           Type of Proceeding: __Habeas Corpus petition__

20           Grounds raised (Be brief but specific):

21           a.___Exactly same as attached hereto___

22           b._____

23           c._____

24           d._____

25           Result: __Denial_____Date of Result: _7-2007_

26       II.    Name of Court: __Court of Appeals, Fifth appellate Dist.__

27           Type of Proceeding: ___Petition for review___

28           Grounds raised (Be brief but specific):

                  Same as attached hereto

a. __Same as attached hereto__

b. _____

c. _____

d. _____

Result: __denied__                 Date of Result: __7-2007__

III.   Name of Court: _____ __california Supreme Court__

Type of Proceeding: __Petition for review__

Grounds raised (Be brief but specific):

a. __Same as attached hereto__

b. _____

c. _____

d. _____

Result: _____ __Denied__           Date of Result: __2007__

IV.   Name of Court: _____ __This instant petition__

Type of Proceeding: __Habeas Corpus__

Grounds raised (Be brief but specific):

a. __Same as attached hereto__

b. _____

c. __Presently before this Court__

d. _____

Result: _____ Date of Result: _____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____     No _X_

Name and location of court: __Does not apply__

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One:_____ See attached petition in full _____

6       _____ // _____

7       Supporting Facts:_____ // _____

8       _____ // _____

9       _____ // _____

10      _____ // _____

11      Claim Two:_____ // _____

12      _____ // _____

13      Supporting Facts:_____ // _____

14      _____ // _____

15      _____ // _____

16      _____ // _____

17      Claim Three:_____ // _____

18      _____ // _____

19      Supporting Facts:_____ // _____

20      _____ // _____

21      _____ // _____

22      _____ // _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  ~~Does not apply to this instant petition, parole suitability denial~~

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Please see attached petition for case citations as authorities

5

6

7    Do you have an attorney for this petition?              Yes_____    No__X__

8    If you do, give the name and address of your attorney:

9    Assisted by fellow inmate with most basic understanding of legaleze

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on 4/3/08

14              Date                        Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 7 -

Court of Appeal, Fifth Appellate District - No. F053314
**S155334**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re WILLIAM RUIZ on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
**FILED**

OCT **1 7** 2007

Frederick K. Ohlrich Clerk

_____
Deputy

_____
Kennard
Acting Chief Justice

IN THE

# Court of Appeal of the State of California

**IN AND FOR THE**

## Fifth Appellate District



COURT OF APPEAL
FIFTH APPELLATE DISTRICT
**FILED**

JUL **2 7** 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

---

In re                                          F053314

WILLIAM RUIZ,

    On Habeas Corpus.

---

BY THE COURT*:

    The "Petition For Writ Of Habeas Corpus," filed in this court on July 18, 2007, is denied.

_____ Acting P.J.

*Before Vartabedian, Acting P.J., Cornell, J., and Gomes, J.

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

JUL 02 2007

LARAYNE CLEEK, CLERK
BY: _____

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF TULARE**

In Re )  Case    No    186293
)
WILLIAM RUIZ )
)  **RULING RE: PETITION**
)  **FOR WRIT OF HABEAS**
)  **CORPUS**
For Writ of Habeas Corpus )
)
_____)

Petitioner has failed to state a basis for relief.

The Court applies the "some evidence" standard of review to the denial of a parole release date by the Board of Prison Terms: *In Re Michael Lowe (2005) 130 Cal.App.4th; 31 Cal Rptr. 3d 1; In re Ramirez (2001) 94 Cal.4th 549, 563; In re Rosenkrantz (2000) 80 Cal. App.4th 409, 423, In re Powell (1988) 45 Cal.3d 894, 904.* Under the "some evidence" standard the Board of Prison term's decision will be upheld as long as there is "some basis in fact" for the decision.

The record shows that there were relevant facts upon which the Board of Prison Terms could and did base their decisions. In arriving at their decision of November 2, 2006 the Board of Prison Terms used the following in denying the petitioner parole in finding he poses an unreasonable risk of danger to society:

1:    (Decision Page 1, Lines 16-26) "The offense was carried out in a manner which demonstrates am exceptionally callous disregard for human suffering–and the motive for the crime was inexplicable and trivial, in relation to the offense. These conclusions are drawn from the Statement of Facts that were reported from the Board Report of the October 2006 Board Report and which I now incorporate by reference. I note that the victim, Salazar, suffered six knife

-1-

wounds. Two in the victim's left fore-ear. One in the left shoulder. One beneath the left eye. A the fatal wound was at the junction of the collarbone and the sternum which severed a large artery and caused the victim to bleed to death into his chest. The prisoner has on previous occasions inflicted or attempted to inflict serious injury on a victim. He has a record of violence or assaultive behavior and an escalating pattern of criminal conduct or violence and has failed previous grants of probation and parole and can not be counted upon to avoid criminality. He failed to profit from society's previous attempts to correct his criminality. Such attempts include juvenile probation, a CYA parole, CYA commitment, and county jail. And an unstable social history and prior criminality which includes battery on a peace officer, obstructing and resisting a public officer, an escape from work camp in Merced County. In addition to being involved in drugs, the prisoner has not sufficiently participated in beneficial self help related to alcohol abuse, and has failed to demonstrate enough evidence through positive change at this time. Misconduct while incarcerated includes 129 A counseling chronos; and two serious 115 disciplinary reports in 2202. One for misuse of State Property, and one that was related to the abuse of alcohol, which is the one that concerns us the most at this time.

It is clear from the record that there was more than enough evidence to justify the denial of petitioner's parole.

Petitioner's Petition for Writ of Habeas Corpus is denied.

Date received by judge: 6-29-07

Dated: 7-2-07

Darryl B. Ferguson
Judge of the Superior Court

-2-

# S U P P O R T I N G    D O C U M E N T S

## 1. PETITION FOR WRIT OF HABEAS CORPUS AS WAS PRESENTED TO THE SUPERIOR COURT OF TULARE COUNTY

## 2. EXBIBIT "A", PAROLE HEARING TRANSCRIPTS

## 3. EXHIBIT "B", Re: MIKAEL SCHIOLD

## 4. EXHIBIT "C", Re: ROBERT ROSENKRANTZ

## 5. EXHIBIT "D", Re: PETITIONER'S MENTAL HEALTH EVALUATION

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years 'to life' shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

### DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. United States Constitutional Amendments, V, XIV.

It is now settled that California parole scheme, codified in California Penal Code section §3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole applicants continue to have a "liberty interest" in parole release.

//

//

1

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE
UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT
OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and U.S. Constitution.

The U.S. Constitutions Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." See also, California Constitution Article I, Sec. 7(a). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that, "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However, Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

2

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B". (With reference to numbered paragraphs).

Schiold was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into a "SETTLEMENT AGREEMENT" transferring Schiold to Sweden. (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7, of Exhibit "B").

Explicitly at paragraph #8 (of Exhibit "B"): "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph #16 (of Exhibit "B"), establishes that; The agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set <u>without</u> <u>being</u> <u>found</u> <u>suitable</u> under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page 3 (of Exhibit "B"), of the "SETTLEMENT AGREEMENT" expressly states that "he will be held in custody of the government of Sweden <u>UNTIL</u> January 1, 2007." Petitioner asserts that this date, January 1, 2007, established a 'term setting' under §3041(a). (Emphasis added).

A foreign national (Schiold) is being treated distinctly different than 'all' U.S. Citizens, and, foreign nationals that have not caused legal actions

3

1  to enter into "SETTLEMENT AGREEMENTS", in California serving a sentence of life

2  with the possibility of parole. Petitioner is being treated distinctly different

3  than Schiold because he cannot be transferred to another country, and all

4  similarly situated prisoners, thus creating separate and distinct "classes" of

5  inmates for release criteria.

6    The fact that Schiold was found suitable by the Board is irrelevant to the

7  claim herein, as the Governor over-ruled the Board's determination and found

8  Schiold to be unsuitable, which nullified the Board's finding of suitability.

9  See, paragraphs #2,3,6 (of Exhibit "B"). Schiold's term was set at January 1,

10 2007, AND, Schiold does not have to serve any parole time after being released.

11 See, "SETTLEMENT AGREEMENT".

12    The most basic requirement for a claim of violation of equal protection

13 under the Fourteenth Amendment of the U.S. Constitution lies on the issue of

14 non-equal treatment of a "CLASS", or, a showing of separate and/or distinct

15 difference in treatment, both criminally and civilly, among groups or "CLASSES"

16 of persons.

17    The U.S. Supreme Court has established a "class of one" in the case of

18 Village of Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073

19 (2000) at pp.1074-75: "We granted certiorari to determine whether the Equal

20 Protection Clause gives rise to a cause of action on behalf of a "class of one"

21 where the plaintiff did not allege membership in a class or group." (527 U.S.

22 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).):

23         "Whether the complaint alleges a class of one or a class of five is
           of no consequence because we concluded that the number of individuals
24         in a class is immaterial for equal protection analysis."

25    Our cases have recognized successful equal protection claims brought by

26 a "class of one", where the plaintiff alleges that he/she has been intentionally

27 treated differently from others similarly situated and that there is no rational

28 basis for the difference in treatment. Sioux City Bridge Co., v. Dakota County,

4

260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburg Coal Co. v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). "In so doing, we have explained that 'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its proper execution through duly constituted agents." Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918).)

"It is clearly established that a state violates the equal protection clauses when it treats one set of persons differently from others who are similarly situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

Petitioner has established separate treatment, discrimination, and the Board's failure to follow U.S. Supreme Court precedents, thus their failure to set Petitioner's term, as was done to Schiold, violates both the California and U.S. Constitutions Equal Protection Clauses.

### FAILURE TO CONSIDER TERM SETTING

At no time during the hearing(s), nor at any time during Petitioner's incarceration has the Board considered the determinate term that Petitioner would serve, as calculated by Title 15 C.C.R. §2404, (Matrix), or the time he has actually served as factors in the suitability equation. The Court of Appeals in, In re Ramirez, (2001) 94 Cal.App.4th 549, at 569 held:

> "The Board cannot ignore the determinate term prescribed for a commitment offense when it considers the gravity of the crime as a factor weighing against a finding of suitability for parole. The Board must make its determination 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public.' (P.C. §3041(a).) Determining what would be a 'uniform' term for an inmate serving a determinate term for offenses that include concurrent determinate terms is not an exact science. However, the Board should strive to achieve at least a rough balance between the gravity of the offense, the time the inmate has served, and the sentences prescribed by law for the commitment offense."

//
//

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At page 570, the court said:

"The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by P.C. §3041(a)."

The gravity of Petitioner's offense must be measured not in terms of the life maximum potential, but in relation to the determinate terms prescribed for such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note: The Board is still in violation by rules and regulations that they are applying.)

## FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. In re Rodriguez, (1975) 14 Cal.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-19. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior Court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as (Exhibit "C") to MOTION FOR JUDICIAL NOTICE, specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term: "On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term." A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (See, Schiold and Rosenkrants, supra), or by sub-summing term-fixing under the parole function. Petitioner is

6

entitled to the fixing of his primary term as an ultimate, immutable release date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment. See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at 502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrants, supra.

In McGinnis v. Royster, 93 S.Ct. (1973) the court held, at page 1057 that:

> "Each inmate has both a 'minimum' parole date, which is the earliest date on which he 'may' be paroled at the discretion of the Parole Board, and a 'statutory release' date which is the earliest date he 'must' be paroled by the Parole Board. (Fn.3), "He also has a maximum expiration date which is the date of the maximum sentence to which an inmate can be held if he receives no good time credits at all."

The case refers to an 'indeterminate sentence' and establishes that there are actually three (3) dates to such a sentence; (1) the minimum parole date, (2) the statutory release date, (3) the maximum expiration date (i.e., death).

While P.C. §1170 et seq., apply to determinate sentences, the current provisions of P.C. §3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176, 182). Our Supreme Court has made it clear that the 'uniform terms' called for by section §3041(a) are analytically equivalent to determinate sentences imposed under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96).

Apparently, the State of California only follows the law and sets a life prisoner's term when it is convenient, to avoid or terminate legal actions (by entering into "SETTLEMENT AGREEMENTS"), or in an arbitrary manner, with no regard to violating due process and equal protection rights under both California and U.S. Constitutional mandated guidelines.

//

//

//

7

STATE AND FEDERAL CLAIM NUMBER THREE (III)
THE STATE OF CALIFORNIA HAS CREATED A MORE COMPREHENSIVE
RIGHT FOR ITS RESIDENTS THAN THE FEDERAL GOVERNMENT FOR THE
APPLICABLE EVIDENCE STANDARD APPLIED TO PAROLE SUITABILITY
HEARINGS UNDER CALIFORNIA EVIDENCE CODE Sec. §115 HEREIN.

The Board of Prison Hearings has violated Petitioner's due process and equal protection rights under the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), a right created by the Legislature of California and by its intent to create an evidence code (§115) that creates a minimal standard of 'evidence' requirement for all situations.

'Some evidence', as applied by the Board, and, used as a judicial tool to review the Board's decision for due process violations, is not the legal standard, especially under California law, see Evidence Code §115; also, U.S. Supreme Court precedents, herein asserted, establish that "preponderance of evidence" is the legal (minimum) evidence standard for parole suitability hearings and not the defunct 'some evidence' standard relied upon by either the Board, and/or Governor. Although the courts do rely on "some evidence" to determine if there is any evidence in the Board's denials (records) it must be "some evidence" that a "preponderance of evidence' exists in the record to support a denial.

The U.S. Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004) stated that:

> "As the Government itself has recognized, we have utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof."

The Court further explains that:

> "It primarily has been employed by courts in examining an administrative record developed after an adversarial process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting." See, e.g., Hill, 472 U.S., at 455457, 105 S.Ct. 2768.

The Hamdi court further explains that: "...for determining the procedures that are necessary to ensure that a citizen is not "deprived of life, liberty or property, without due process of law," U.S. Const. Amdt. 5, is the test that

8

we articulated in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d

18, (1976):

> "We agree with the prevailing view and conclude that Hill addressed
> only the appropriateness of 'some evidence' as a standard of appellate
> review, not as a standard of proof. Therefore, we now seek to determine
> through our own analysis the appropriate fact-finding standard to be
> used by the DOC. To determine whether a standard of proof in a
> particular type of proceeding satisfies due process, the Supreme Court
> has prescribed a three-factor test that examines: (1) the private
> interest affected, (2) the risk of erroneous deprivation of such
> interest, and (3) the government's interest."

In Carrillo, Supreme Court of Minnesota, 710 N.W.2d 763, 2005 Minn. LEXIS,

424, Filed July 28, 2005, that court relied on Eldridge and Hamdi and held that:

> "Taking the Supreme Court's three factors into consideration, we
> conclude that the "some evidence" standard is inappropriate for use
> by the DOC at the fact-finding level. We conclude that the
> "preponderance of evidence" standard better protects against an
> erroneous deprivation of an inmate's liberty interest in his supervised
> release date and does not pose an unacceptable burden on the DOC.
> Therefore, we conclude that a DOC hearing officer must find by a
> preponderance of evidence that Carrillo has committed a disciplinary
> offense before the commissioner can extend the date of his supervised
> release. Accordingly, we hold that the district court and the court
> of appeals erred when they denied Carrillo's petition for writ of habeas
> corpus."

The State of California, by Legislative intent, has conferred more, or a

greater, evidence standard upon the Board, and Governor's review, (and judicial

review), by making the 'minimum' evidence standard "preponderance of evidence",

rather than that espoused in Hill, i.e., "some evidence". See also, Jurasek v.

Utah State Hospital, 158 F.3d 506 (10th Cir. 1998), "The state may confer more

comprehensive due process protection upon its citizens than does the federal

government."

Petitioner contends that a reasonable understanding of the holding in Hamdi

v. Rumsfeld, relied upon in Carrillo, supra, Eldridge, supra, is that a court

will apply the "some evidence" standard to review records, of both the Board's

and Governor's denials for suitability of parole, to see if there was proof under

the "preponderance of evidence" standard mandated by California Evidence Code

9

1  Sec. §115, not, that the record of the Board's, or Governor's, denial of

2  suitability, decision only requires "some evidence" of proof, as is always applied

3  by the Board for denial, and, by the Governor for review.

4  Petitioner's due process rights were violated when the defunct minimally

5  necessary evidence (some evidence) standard was applied in place of preponderance

6  of evidence as is mandated by California Evidence Code section §115, second

7  paragraph; "Except as otherwise provided by law, the burden of proof requires

8  proof by a preponderance of the evidence."), and U.S. Supreme Court precedents

9  herein listed.

10  Thus, the Hill, supra, "some evidence" standard is being applied to

11  circumvent and over-ride the California Constitutions duly elected Legislatures

12  intent to confer a greater due process protection upon its citizens when they

13  enacted Evidence Code §115 (Preponderance of evidence as the minimal standard

14  of proof or review) than does the federal courts Hill standard of "some evidence".

15  //

16  //

17  //

18

19

20

21

22

23

24

25

26

27

28

STATE AND FEDERAL CLAIM NUMBER FOUR (IV)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS RIGHTS
UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY DENIED PAROLE SUITABILITY BASED ON UNCHANGING
FACTORS/CIRCUMSTANCES, i.e., HISTORICAL EVENTS, AND APPLYING
ARBITRARY AND CAPRICIOUS CONCLUSIONS TO BOOTSTRAP A
PREDETERMINED DENIAL OF SUITABILITY.

## SUMMARY OF DENIAL

### Exhibit "A" at pages 44-48

1). "...the prisoner is not suitable for parole at this time and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

2). "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering -- and the motive for the crime was inexplicable and trivial in relation to the offense."

3). "The prisoner has on previous occasions inflicted or attempted to inflict serious injury on a victim."

4). "...an unstable social history and prior criminality which includes battery on a peace officer..."

5). "The prisoner has not sufficiently participated in bebeficial selfhelp related to alcohol abuse." "And has failed to demonstrate enough evidence through positive change at this time."

6). "Misconduct while incarcerated includes 128A counseling chronos; the last of which was August 5th, for grooming standards, and two serious 115 disciplinary reports in 2002; one for misuse of State property, and one that was related to the abuse of alcohol, which is the one that concerns us the most at this time."

7). "The psychological report dated October 16th, 2006, and authored by Dr. Cynthia Glines, we believe is <u>inconclusive</u> in that the risk for violence assessment is <u>ambiguous</u> as your attorney argued." "We do agree with your argument

11

on that and believe that it is necessary to have a new Psych Report to clarify that situation." (Emphasis added).

8). "And again, we have a concern regarding the 115 for alcohol in 2002, considering the role of alcohol and drugs in the commitment offense." "And we believe additional self-help is needed in that particular area."

9). "...the prisoner needs additional self-help in order to face, discuss, understand, and cope with stress in a nondestructive manner, and until additional progress is made the prisoner continues to be unpredictable and a threat to others."

10). "The prisoner's gains as to abstinence from alcohol are recent, and he must demonstrate an ability to maintain gains over an extended period of time."

11). "And we are going to ask that the Psych Report specifically clarify the ambiguity of Dr. Glines 10/16/06 Risk for Violence Assessment as to the low to moderate." (Emphasis added).

## RELIANCE ON HISTORICAL EVENTS

The commitment offense and conduct prior to imprisonment was also used at Petitioner's initial (1st) suitability hearing to deny parole. The denial of parole regardless of Petitioner's, over 33 years, (which includes earned credits), and evidence of rehabilitation (even though followed by a relapse with alcohol in 2002), and remorse, and the current denial based on the same events violates due process of law.

Post Dannenberg cases (In re Dannenberg, 34 Cal.4th 1061 (2005) indicate this to be true. Including such recent cases as In re Wen Lee, California Court of Appeal, Second Appellate District, Division Eight, 2006 DJDAR 13961, where the governor denied parole because of Lee's "late acceptance of responsibility, that Lee's acceptance was "too recent". The Governor concluded Lee's acceptance was too recent to tip in his favor. To deny parole, the reason must relate to

a defendant's continued unreasonable risk to public safety. "So long as Lee genuinely accepts responsuibility, it does not matter how longstanding or recent it is". As Justice Felix Frankfurter observed, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." (Henslee v. Union Planters Bank (1949) 335 U.S. 595, 600 (dis. opn. of Frankfurter, J.).) The same can be said about responsibility and remorse. (Id., at page 13965.

Petitioner asserts that from 1982 to 2002 he did not have one infraction of rules regarding alcohol, yet, in 2002, he 'relapsed', and the Board states that his "gains as to abstinence from alcohol are recent". Petitioner has diligently attended AA and has help from his sponser, but, no distance from the 2002 'relapse' will ever be sufficient for the Board and the 2002 'relapse' is an unchangeable event within the intent of Scott.

COMMITMENT OFFENSE

As the recent Court of Appeals in, In re Scott, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905 (2005) regarding the continuous use of conduct prior to imprisonment wrote:

> "[A]lthough reliance on conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements by state law, where an inmate over time continues to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of prior conduct would raise serious questions involving his liberty interest in parole." (Id. at p.335, citing also, Irons v. Warden of California State Prison – Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947, and:

> The California Supreme Court in In re Jeanice D., (1980) 28 Cal.3d 210–213, rejected the argument of the Attorney General that a sentence of 15/25 years to life is a determinate life sentence. This reasoning also applies to Petitioner. The commitment offense does not automatically turn Petitioner's parolable offense under the law into a determinate life sentence. (See also, In re Thompson, 253 Cal.Rptr. 513, 516 [same]). Placing unchecked constraints on the amount of times the commitment offense may be used to deny parole would "convert a court reviewing the denial of parole into a potted plant." (See, In re Scott, 119 Cal.Rptr.4th 871, 898 (2004).)

Shaputis held that reliance on a parole applicant's "former life style" prior to imprisonment to deny parole, that such reliance on such an "historical

13

relic" is an "arbitrary and capricious [decision] within the differential standards articulated by Rosenkrantz, 29 Cal.4th 616." (Shaputis, 37 Cal.Rptr.3d at 335; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 2006 WL 2327085 at *15 (C.D. Cal. 2006) [citing Shaputis for the same proposition]).

Even the court in In re Rosenkrantz, supra, 29 Cal.4th 616 (2002), indicated that the Board <u>may</u> <u>not</u> indefinitely rely on the nature of the offense to find petitioner unsuitable for parole. A close examination of what the California Supreme Court stated in Rosenkrantz illuminates this reasoning:

> "The nature of the prisoners offense, alone can constitute a sufficient basis for denying parole, (In re Minnis, 7 Cal.3d 639, 647; In re Ramirez, 94 Cal.App.4th 549, 569; In re Seabock, (1983) 140 Cal.App.3d 29, 36-37.) <u>Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals whom have been convicted of a particular type of offense,</u> the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by the defendant." (Rosenkrantz, 29 Cal.4th at 682-683.) (Emphasis added.)

The emphasized portion applies equally well to prohibit blanket rules against Petitioner. (Id. at 682 [recognizing inmate has a protected right to be "considered <u>on an individual basis</u>"], emphasis added in original). Rosenkrantz not only recognizes a due process "liberty interest" in parole (Id. at 654, 661), it also recognizes that Petitioner has a right to individual consideration of parole aimed at determining whether Petitioner presents an unreasonable risk to the public if he is released on parole. The crime's facts may be considered, but not if it makes a blanket rule that Petitioner is unsuitable for parole. (As was done in the instant case at bar).

In Rosenkrantz, because he felt "humiliated" by a family friend, purchased an UZI and 250 rounds of ammunition, practiced firing the weapon, confronted his victim and shot the victim "at least 10 times", "including six wounds to the head." (Rosenkrantz, 29 Cal.4th at 628-629). After years of court litigation, the Superior Court of California for the County of Los Angeles in In re Rosenkrantz, Case No. BH003529, filed June 26, 2006, released Rosenkrantz, citing

14

that the repetitive use of the circumstances surrounding the commitment offense and conduct prior to imprisonment violated due process, writing:

> "The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (Biggs v. Terhune, (9th Cir. 2003), 334 F.3d 910, 916). However, over time, should petitioner continues to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (Id. at p.917).

In the case at bar, Petitioner was denied, in part, on his rule violation in 2002 for alcohol use, and, Petitioner asserts that the 'only' rule violation that could be construed as bolstering the Board's unsuitability because of dangerousness to the public safety was in January of 1995, classified as "mutual combat". (See, Exhibit "D") and after 12 years it must be considered to be an "historical relic", also, a clasification of "mutual combat" is a catch-all phrase used by CDC to simply not have to determine who was the aggressor and who was the victim, or even if a fight actually ensued.

The Board's continued reliance on unchanging factors and historical relics, the circumstances of which can never change, have converted Petitioner's commitment offense from a Second degree murder, past the First degree murder Matrix and Petitioner is entering into a life without the possibility of parole term. Petitioner has no chance of obtaining parole unless the Board holds that his commitment offense was not serious enough to warrant a denial of parole. (Irons v. Warden, (E.D. Cal. 2005), 358 F.Supp.2d 936, 947.)

The Board's continued reliance on the commitment offense violates due process because the facts surrounding the offense do not now constitute 'some evidence' with 'some indicia or reliability' of Petitioner's current dangerousness. See, Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner v. State 2004 WL 1080177 *1-2 (C.D. Cal. 2004). (Id. at *16).

This reasoning is in line with Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), in which the Ninth Circuit Court of Appeals upheld that the Board's reliance on the sole factors of the commitment offense to deny parole to a prisoner at his minimum eligible parole date, despite an intervening period of exemplary behavior violates due process. Nevertheless, the Biggs court stated:

> "The parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be <u>initially justified</u> as fulfilling the requirements set forth by the state law.
>
> Overtime, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Bigg's offense and prior conduct would raise serious questions involving his liberty interest." (Biggs, supra, 334 F.3d at 916).

The court in Bair v. Folsom State Prison, 2005 WL 2219220, *12 fn.3 (E.D. Cal. 2005), report and recommendation adopted by 2005 WL 3081634 (E.D. Cal. 2005)), held that:

> "Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility decision can only be predicated on the 'predictive value' of the unchanged circumstances. Otherwise, if the unchanged circumstances per se can be used to deny parole eligibility, sentencing is taken out of the hand of the judge and totally reposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole — a sentence with the fact of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, <u>what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system.</u>"
>
> > "...the offense was carried out in an especially cruel manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering -- and the motive for the crime was inexplicable and trivial in relation to the offense." (See, DECISION, Exhibit "A" at p.44).

Noting that the Board did not use the language 'heinous', 'atrocious' but rather the wording of "cruel" and "callous", Petitioner asserts that his

This reasoning is in line with Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), in which the Ninth Circuit Court of Appeals upheld that the Board's reliance on the sole factors of the commitment offense to deny parole to a prisoner at his minimum eligible parole date, despite an intervening period of exemplary behavior violates due process. Nevertheless, the Biggs court stated:

> "The parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be <u>initially justified</u> as fulfilling the requirements set forth by the state law.

> Overtime, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Bigg's offense and prior conduct would raise serious questions involving his liberty interest." (Biggs, supra, 334 F.3d at 916).

The court in Bair v. Folsom State Prison, 2005 WL 2219220, *12 fn.3 (E.D. Cal. 2005), report and recommendation adopted by 2005 WL 3081634 (E.D. Cal. 2005)), held that:

> "Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility decision can only be predicated on the 'predictive value' of the unchanged circumstances. Otherwise, if the unchanged circumstances per se can be used to deny parole eligibility, sentencing is taken out of the hand of the judge and totally reposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole — a sentence with the fact of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, <u>what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system."</u>

>> "...the offense was carried out in an especially cruel manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering -- and the motive for the crime was inexplicable and trivial in relation to the offense." (See, DECISION, Exhibit "A" at p.44).

Noting that the Board did not use the language 'heinous', 'atrocious' but rather the wording of "cruel" and "callous", Petitioner asserts that his

1    offense was no more "cruel" or "callous" than the following recent cases from

2    the appellate courts of California, in part:

3         In the decision by the Second Appellate Court of California, Division Eight,

4    in the case of Wen Lee, (2006), 49 Cal.Rptr.3rd 931. Lee went armed with a gun

5    and box of ammunition. He had decided that If Soong refused to pay, he would

6    kill Soong and then himself. Lee drove 15 minutes to the restaurant and asked

7    Soong for his money. Soong shook his head and said that he did not have time

8    to talk. Lee pulled out his gun and fired five times before the gun jammed.

9    He hit Soong twice, who survived the shooting, but one of the bullet's hit

10    Soong's wife in the head, killing her. (Note* Two (2) victims and five (5) shots

11    fired). Lee was sentenced to Second degree murder.

12         At pp.937-938, the court stated that: "...they were not 'atrocious', or

13    at least no more atrocious than whenever one human being kills another - and

14    were not committed "in an especially heinous, atrocious or cruel manner." the

15    measure of atrociousness is not general norms of common decency or social norms,

16    for by that yardstick all murders are atrocious. (See, In re Scott, supra, 119

17    Cal.App.4th at p.891, "All second degree murders by definition involve some

18    callousness - i.e., lack of emotion or sympathy, emotional insensitivity,

19    indifference to the feelings, and suffering of others.") Rather, the inquiry

20    is whether among murders, the one committed by Lee was particularly heinous,

21    atrocious or cruel. (In re Ramirez, supra, (2001), 94 Cal.App.4th 549, 570,

22    disapproved on another point by In re Dannenberg, supra, (2005), 34 Cal.4th

23    1061, 1082-1083, 1100). "By that measure, Lee's crimes were more commonplace

24    than egregious."

25         "Comparing Lee to defendants for whom the Board or governor properly denied

26    parole because the defendants crimes were atrocious is illuminating."

27    Rosenkrantz, supra, 29 Cal.4th at p.678; In re Dannenberg, supra, 34 Cal.4th

28    at p.1095; In re McClendon, (2003), 113 Cal.App.4th 315 at pp.321-322; In re

Burns, (2006), 136 Cal.App.4th 1318 at pp.1327-1328; In re Van Houten, (2004), 116 Cal.App.4th 339, at pp.346, 351, 366; In re Deluna, (2005), 126 Cal.App.4th 585 at p.593; In re Lowe, 130 Cal.App.4th 1405 at p.1414; In re Morrall, (2002), 102 Cal.App.4th 280.

Petitioner contends that, in the above cases of Wen Lee (nearly a 'double' murder), and the following case of Weider, the State of California has established what offenses and their circumstances constitutes the terminology of 'especially or exceptionally callous, particularly egregious, heinous, atrocious or "cruel". Wen lee or Weider did not fall under these categories and neither does Petitioner's commitment offense.

In a most recent decision, December 6, 2006, by the Sixth Appellate District Court of California, 2006 DJDAR 15795, In re Bernard John Weider. That appellate court's decision was based on the same subject matter as Petitioner's, in that Weider was denied parole based on the Board's determination that the commitment offense was carried out in an especially "cruel" or "callous" manner.

In summary of the commitment offense, Weider and his wife Susan separated and she moved in with a man named George Laird. Two years after the separation Weider stopped at a restaurant to get something to eat. Weider's wife Susan and Laird were there and an argument ensued. Weider went to his car and retrieved a .380 caliber handgun and returned to the restaurant, where Weider fired the gun twice at Laird and missed. Laird ran behind the bar and Susan wrestled with Weider. Laird came back to the front of the restaurant, grabbed a bottle from the bar, and hit Weider over the head. Laird grabbed for the gun and he and Weider struggled over it. Patrons of the bar started to help Laird, and as Weider and Laird struggled on the floor, several shots were fired. Laird received two shots, one contact wound, at close range and died, two other patrons were shot, one twice. (Nearly a 'triple' murder).

Weider was convicted of Second degree murder and two counts of assault

18

1    with a firearm. He was sentenced to an indeterminate term of 15 years to life.

2        At p.15800: "The only remaining factual basis for the Board's 2005 decision

3    is it's conclusion that the commitment offense was carried out in an especially

4    cruel and callous manner in that there were multiple victims, the crime was

5    carried out in a "dispassionate and calculated manner", and "showed a callous

6    disregard, if nothing else, for your community." (§2402, Subd. (c)(1)(A)(B)(D).)

7        At p.15801: "We first note that appellant rightly does not attempt to

8    justify the Board's finding that the crime was committed in a manner that showed

9    a callous disregard or lack of respect for the "community". The standard is

10   whether the crime was committed in a manner that showed, exceptionally callous

11   disregard for human suffering. (§2402, Subd. (c)(1)(D).) There is no evidence

12   of that here."

13       "The Board's finding that the crime was "dispassionate" and "calculated"

14   does not conform to the appropriate standard either. The finding was based upon

15   evidence that Weider "took a weapon into a bar, into a public place". But in

16   deciding whether the crime was particularly heinous, atrocious, or cruel, the

17   Board is to consider whether "[t]he offense was carried out in a dispassionate

18   and calculated manner, such as an execution style murder". (§2402, Subd.

19   (c)(1)(B).) The murder the Board describes is not at all like an execution-style

20   murder. The fatal wound was delivered during the struggle over the gun. And

21   there was no evidence that Weider conducted himself dispassionately. To the

22   contrary, the evidence shows that he was angry and distraught."

23       Petitioner asserts that, the above entitled cases of <u>Wen Lee</u>, <u>Weider</u> and

24   <u>Rosenkrantz</u> ALL had the elements of pre-meditation which constitutes First (1st)

25   degree murder, yet all of these persons who committed these offenses were

26   released after serving 20 years or less.

27       Petitioner stated, in Exhibit "A" and "D" that he ran into the victim at

28   a party, the victim was the person that, some time prior, threw a bottle at

19

1    Petitioner, striking him in the eye and causing major damage and loss of vision.

2    When Petitioner saw the victim coming towards him at a fast pace, reaching into

3    his crotch area, and Petitioner perceiving a threat to his safety and he struck

4    out at the victim. Nothing can change that night and Petitioner admitted that

5    "At the time, I was abusing drugs and I made bad choices." (Exhibit "D").

6        In the case of In re Jeffrey David Elkins, Case No. A111925, 2006 DJDAR

7    14489, California Court of Appeals, First Appellate District, Division Two.

8    Elkins beat his victim with a baseball bat then robbed him. At p.14492: "And

9    Mr. Elkins actions after the murder demonstrated those of a cold-blooded,

10   dispassionate killer". As described in a 1980 letter from the Alemeda County

11   District Attorney's office to the probation office after the murder, Mr. Elkins

12   placed Mr. Ecklund's body in the trunk of his car, went back into his friend's

13   house, took a shower, and went many miles into the mountains, located a desolated

14   area, and dumped Mr. Ecklund's body down a steep grade.

15       At p.14497: "Rather, the decision concludes that Elkins actions after the

16   murder demonstrated those of a cold-blooded, dispassionate killer". It cites

17   Elkins going ahead to take Ecklund's wallet, money, and drugs, driving to Donner

18   Pass the next morning and dumping it down a steep grade, stealing from Ecklund's

19   storage unit and his girlfriend's residence over the next several days, and

20   then fleeing the state."

21       At the same page, 14497, the court concluded, "given the lapse of 26 years

22   and exemplary rehabilitative gains by Elkins over that time, continued reliance

23   on these aggravating factors of the crime no longer amount to "some evidence"

24   supporting denial of parole." (Emphasis added).

25       Petitioner contends that, although his offense, tragic as it was, is not

26   of the same severity as that of Elkins, or any of those cases listed above,

27   but the Board used the aggravating factors of Petitioner's offense, after 33

28   years (which includes earned credits) of not one current/recent instance of

1    violence thus positive rehabilitative gains to deny him parole.

2         Petitioner agrees that every murder is tragic, but, Petitioner's offense
3    does not fall into the particularly egregious, heinous, atrocious or cruel,
4    and, the jury did not find special circumstances to be true in their decision,
5    i.e., "execution-style murder".

6         Petitioner's commitment offense, considering the circumstances of how the
7    offense occurred and what motivated the offense, should not be considered the
8    same in severity as the above cases of Rosenkrantz, Wen Lee, Weider or Elkins.
9    Therefore, the language of Title 15 C.C.R. §2402 should not and must not be
10   applied to Petitioner.

11        This Court must at some point in time determine when the U.S. Constitutions
12   Fifth and Fourteenth Amendments due process violations commence. One would reason
13   that after the inmate's initial (1st) parole hearing, the crime and other
14   unchangeable factors could not constitutionally be applied as an unsuitability
15   factor for parole.

16        As several courts have held, that continued use of unchanging factors
17   'could' result in a due process violation. Petitioner submits that if there
18   is a 'cut off point' where the due process violation would 'finally' occur it
19   would be then reasonable to assume that the due process violation does occur
20   after the first (1st) usage of the unchangable factors, or automatic denials
21   based on unchangable circumstances would become commonplace.

22        Petitioner contends that, he has been incarcerated for over 33 years (which
23   includes earned credits), he has a mutual combat offense in 1995, he has applied
24   his rehabilitation goals in a very positive manner to the extent that he
25   previously postponed his suitability hearing until he completed his dry cleaning
26   course (see, exhibits "A" and "D"), he has consistently attended "AA" and "NA"
27   programs, he has furthered his education and work skills.

28        To continuously deny Petitioner parole because of his conduct prior to

21

imprisonment, and as a juvenile, and his 1995 mutual combat prison history and commitment offense equates to a due process violation under the Fifth and Fourteenth Amendments because Petitioner can never change the "unchangeable" circumstances used for parole suitability denial no matter how many years pass by the circumstances of "historical relics" cannot be changed.

Petitioner has expressed remorse for making that wrong decision so long ago, he has expressed many times his desire to change that night, but, he cannot change or alter history or past events no matter how hard he wishes to do so.

Petitioner has taken full responsibility for that tragic evening, and the reasons that led up to it. There is no evidence in the record that Petitioner needs to come to terms with what happened that evening as articulated by the Board's excuse for denial.

A crime is "particularly egregious" when elements of 'special circumstances' were found that would authorize a sentence of life without the possibility of parole or the death penalty. See, In re Leslie Van Houten, 116 Cal.App.4th 339, (2004). (Note* In Van Houten, the jury found special circumstances to be true at her trial).

Petitioner's commitment offense clearly falls within the Matrix, at the Second degree and First degree scale, and, there were no special circumstances charged or found to be true at his trial that converted his term from a Second degree murder to a First degree murder as the Board has done, thus the Board cannot apply subdivision (b) of §3041 to his suitability hearing. Additionally, several courts have used the language of "ax murder", "execution style murder", when compared to "normal", "ordinary run", "common scenario", "conventional" when addressing NON particularly egregious murder cases. (Citations omitted).

Properly viewed, under the facts presented above, Petitioner's commitment offense simply cannot be placed in the First degree or life without the possibility of parole category as the Board has done to justify a denial of

1    parole pursuant to §3041(a)(b).

2       Petitioner asserts that, in the Board's DECISION, there is not one word

3    indicating the usage of <u>particularly egregious</u> or any other language that could

4    be remotely construed as such to convert a Second degree offense to one of First

5    degree or life without the possibility of parole. The only rote/form language

6    used to deny him a parole date were "cruel", "callous", "inexplicable",

7    "trivial", which are virtually used in ALL parole suitability denials, but,

8    those words are already found in the Matrix guidelines and are thus not an

9    exceptional issue.

10       In, In re Ramirez, Marin County Superior Court, Case No. SC10982(A) (9-

11   13-2000), (94 Cal.App.4th 549), the court held that: parole could not be withheld

12   absent a factual finding that the offense was "particularly egregious". (This

13   claim is lacking in Petitioner's denial, see Exhibit "A").

14       The Board's decision was arbitrary and capricious as there was no

15   legitimate, logical reason for the denial of a release date as Petitioner has

16   served over the time, see Matrix, for a First degree murder (and is now serving

17   the term for life without the possibility of parole).

18       In a most recent case from the Northern District of California, Willis

19   v. Kane, No. C05-3153 MHP (pr)., April 26, 2007, F.Supp.2d, 2007 WL 1232060

20   (N.D. Cal.), in part at (*10):

21                   E. Willis Is Entitled To Have His Term Set

22          "Willis' petition for writ of habeas corpus is GRANTED. having decided
            that the petition will be granted, the next issue concerns the proper
23          remedy. <u>Because</u> <u>Willis</u> <u>has</u> <u>never</u> <u>been</u> <u>found</u> <u>suitable</u> <u>for</u> <u>parole</u>, the
            BPH has never moved past the suitability-finding function in <u>California</u>
24          <u>Penal Code</u> §3041(b) to calculate a term and set a release date as
            required by §3041(a). It is now time to do so. Within thirty days
25          of the date of this order, the BPH must calculate a term for Willis
            and set a date for his release in accordance with the requirements
26          of <u>California Penal Code</u> §3041(a)..."

27       As set forth in CLAIM NUMBER TWO (equal protection claim), the court in

28   <u>Willis</u> did not order the BPH to hold another meaningless hearing to find Willis

                                          23

'suitable' under §3041(b) then proceed to term setting under §3041(a), but rather, the court simply directed the BPH to "calculate a term for Willis and set a date for his release in accordance with the requirements of California Penal Code §3041(a)."

As is dictated by the Willis court, Rosenkrantz, supra and Schiold, supra, term setting under §3041(a) is not predicated upon a finding of suitability under §3041(b). Term setting is independent of being found suitable as the Willis court, and Rosenkrantz, supra, court did when the courts ordered the BPH to set a term even though suitability was not found under subsection (b) of §3041.

## PSYCHIATRIC EVALUATION ASSESSMENT/THREAT LEVEL REPORT

As is expressed in Exhibit "D" and the Board's decision at Exhibit "A", pages 44-47, the Board stated, pasim, that:

> 1). At p.45-46; "The Psychological Report dated October 16th, 2007, and authored by Dr. Cynthia Glines (the Board's Psychiatrist), we believe is inconclusive in that the risk for violence assessment is ambiguous as your attorney argued. We do agree with your argument on that, and believe that it is necessary to have a new Psych Report to clarify that situation."

> 2). At p.47; "...and be able to participate further in self-help and cooperate with clinicians in the completion of the new Psych Evaluation. And we are going to ask that the Psych Report specifically clarify the ambiguity of Dr. Glines 10/16/06 Risk for Violence Assessment as to the low to moderate." (Emphasis added).

Petitioner asserts that there is no ambiguity or confusion as to the evaluation (Exhibit "D"), under RISK FOR VIOLENCE; "On each instrument an individual may be scored as low, moderate or high." (Emphasis added).

> "Taken together the three weigh over 20 different factors that have been found to contribute to the risk for future violence. The instruments focus primarily on historical factors, as the research to date supports these as having the best predictive value in determining risk for future violence. Dynamic factors (those that have the potential to change) are also considered. Given the instruments reliance on historical factors, someone with a history such as Mr. Ruiz's will always present a higher risk for future violence than a person in the free community who has not engaged in violent criminal behavior." (Emphasis added in underline and bold).

"Dr. Livingston concluded that the risk for recidivism on a violent crime while in the free community was within the <u>moderate range</u>. Since that evaluation, there have been no significant changes that would alter this finding. Further, the instruments were independently rescored. His score on the dynamic factors, which tends to reflect current level of functioning, was within the low range. However, <u>because of his background</u>, Mr. Ruiz's score on the <u>historical items</u> are such that his overall score will <u>never be less than low-moderate</u>, regardless of any positive programming he has done. Therefore, the risk for recidivism on a violent crime while in the free community remains within the <u>low-moderate to moderate range</u>. (Emphasis added)."

Although the Board appeared confused by the "low-moderate to moderate range" adopted by their Psychiatrist, Petitioner asserts that there is no confusion what-so-ever.

Simply stated, because of Petitioner's "historical" events of criminal behavior, no matter what positive programming he may do, for how ever long he attends AA, NA or obtains positive chronos, letters of support, more educational programming, he will **NEVER** be less than low-moderate. The Psychiatrist simply included Petitioner's historical past events of criminal conduct and when evaluating the facts as a whole he concluded that Petitioner is not a "current" threat to the public on a scale of low; low-moderate; moderate and so on.

"Future" threat level is not the criteria as many courts have stated that "current" risk level is the gateway to a finding of suitability.

Petitioner's Psychologist Evaluation Report (Exhibit "D") and, the hearing transcripts (Exhibit "A") are replete with positive programming, educational advances, learning trades, attending "AA", NA" and other group activities, he has several job offers, family support and several residences available.

The Board's Commissioners are not legally permitted to assume the role of expert witnesses and therefore cannot reassess the findings or re-weigh the importance of an individually prepared and detailed report by a state licensed professional psychiatrist/psychologist staff. The hearing record is completely void of any listed 'expertise' regarding the Commissioners educational background or state license or psychological training that gives them the 'right' or

1   'authority' to over-ride (or be confused by the wording) a legitimately prepared

2   psychological report based on a 'whim/excuse', or, when it does not support

3   their denial, which is almost always done by the Board if the report is even

4   slightly positive of release on parole.

5       The psychologists have cleared Petitioner of any need for additional therapy

6   'or' self-help. There must be a factual underpinning to support the Board's

7   denial. See, In re Caswell, (10-10-01), 92 Cal.App.4th 1017, 1027; In re

8   Rosenkrantz, supra, 80 Cal.App.4th 409; In re Ramirez, 94 Cal.App.4th 1017.

9                   ### PENAL CODE §3041 REQUIREMENTS

10      The test for P.C. §3041 requirements is that of an assessment of the

11  individual's current risk, and not a potential or future risk. Forecasting into

12  the far future of Petitioner's violence potential has been prohibited by the

13  California Supreme Court. See, People v. Murtishaw, (1978) 29 Cal.3d .733, 737.

14  As in Murtishaw, the subsequent lineage of death penalty comments continue to

15  hold that while a prosecutor's comments about future dangerousness during closing

16  arguments are allowed, the prosecutor may not rely on a psychiatric excert's

17  opinion as to a defendant's future dangerousness. See, People v. McDowell, (1988)

18  46 Cal.3d 551, 571; People v. Bean, (1988) 46 Cal.3d 919; People v. Fudge, (1994)

19  7 Cal.4th 1075, 1117; People v. Medina, (1995) 11 Cal.4th 694, 767. Concluding

20  that 'expert' forecasts of future violence is notoriously unreliable, i.d.,

21  768-769, and often brand as 'dangerous' many persons who are in reality totally

22  harmless.

23      The U.S. Supreme Court case of Kansas v. Crane, No. 00957, 2002 DJDAR ___,

24  held, in cases of sex offenders being confined civilly beyond their original

25  criminal sentences, that states must prove these inmates have both a mental

26  disorder and a serious difficulty controlling their behavior before they can

27  be imprisoned beyond their time.

28      Despite the obvious differences in offences, the principle is the same:

                                26

the key message from the Kansas court, to be compared to the instant petition, is that the BPT must show proof of something more than just a psychiatric report that may not be "totally supportive of release" in order for that to constitute a denial of parole and to convert Petitioner's term from Second degree murder into a life without the possibility of parole, as what is being done.

There must be "specific facts" and a "rational basis" for a departure from parole guidelines. Misasi v. U.S. Parole Comm., 835 F.2d 754 (10th Cir. 1987).

The Board based part of its unsuitability for the parole decision, (see, Exhibit "A", pasim), on Petitioner's involvement in Alcoholics Anonymous. This is a violation of Petitioner's U.S. Constitutional Right of due process and equal protection under the Fourteenth Amendment as it pertains to the First Amendment.

In the case of <u>Turner v. Hickman</u>, 342 F.Supp.2d 887 (E.D. Cal. 2004), the court held that: requiring a California life prisoner to attend Narcotics Anonymous (NA), or, Alcoholics Anonymous (AA) as a predicate for parole constitutes a state establishment of religion prohibited by the First Amendment. Furthermore, the court enjoined the Board of Prison Terms (BPH) from ever imposing such a requirement in the future and orders all records of past references to the prisoner's failure to attend NA be expunged from his records. See, also, <u>Lee v. Weisman</u>, 505 U.S. 577 (1992); <u>Kerr v. Farrey</u>, 95 F.3d 472 (7th Cir. 1996); <u>Warner v. Orange County Dept. of Probation</u>, 115 F.3dd 1068 (1997). (Petitioner's Note* The Board's 'new' scam to get around the courts orders is to "suggest" and "not order" AA and/or NA for the inmate, the result is the same no matter how cleverly the Board gets around the wording of the courts orders).

## GENERAL/OVERALL/SUITABILITY ISSUES

A most recent case from the California Court of Appeal, First Appellate District, Division Two, In re David Barker, 2007 DJDAR 7548, Filed May 24, 2007,

at 7555, the court held that:

> In speaking to the psychologist report; "These conclusions, of course, are the opinions of trained experts, all of whom said Barker did not need therapy. We are troubled therefore by the contrary finding, especially in light of the uncontradicted evidence in the record. And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record—and despite repeated criticisms from the courts. The harsh criticism by Division Three of this Court in In re Ramirez, (2001) 94 Cal.App.4th 549 (Ramirez), disapproved on another ground in In re Dannenberg, (2005) 34 Cal.4th 1061, 1086–1087, 1100 (Dannenberg), is illustrative. There Justice Parrilli first described the finding of the "need for further therapy" as an even "more troubling aspect" of the Board's decision, explaining why it was utterly unfounded. She then concluded as follows: "This finding was an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also the Department of Corrections, which provides the therapeutic programs and found Ramirez's participation in them to be outstanding. The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." (Etc., at page 7556.)

### CASE LAW AND STUDIES OF LIFER RECIDIVISM

In Hendking v. Smith, 781 F.2d 850 (11th Cir. 1986) ("[I]t is a matter of general knowledge that except for professional killers, few people commit more than one murder in a life time. It is a crime involving a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL 2327085 at *12–17).

### PROFESSIONAL STUDIES

"Studies of parole success repeatedly indicate that those who commit murder are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation and Parole in America, P.254, 1985, citing Niethercut, 1972. Both with regard to the commission of felonies in general and the crime of homicide, no other offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing NCCD Newsletter, Uniform Parole Reports, 1972, p.2.

1  "Compared with other groups, murderers are actually the best parole risks."
2  Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing
3  Stanton, p.149, 1969. Two studies indicate that only three in ten thousand and
4  six in ten thousand convicted of murder commit another crime. Bedau, Hugo Adams,
5  The Death Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a
6  study for the California Board of Prison Terms (1983-1987) it was concluded
7  that no one released after committing a murder had been returned to prison for
8  murder. Ellwood, Eldridge T., PH.D., Research Projects On Life Prisoners, p.3,
9  April 1989, California BPT. "As a matter of statistical probability, murderers
10 released from prison are far less likely to commit a new crime than any other
11 category of offender." Orland, Leonard, Justice, Punishment, Treatment, p.425,
12 1973. "Many murderers could be released immediately after conviction with little
13 likelihood of offending again." Von Hirsh, Andrew, Doing Justice, Report On
14 The Committee Of Offending Again." Von Hirsh, Andrew, Doing Justice, Report
15 On The Committee For The Study Of Incarceration, p.125, 1976. These authorities,
16 from some of the most respected sociologists in our country, reveal the fallacy
17 of assumptions regarding the dangerousness of those convicted of murder.

18     Petitioner needlessly points out to the Court that given the above
19 professionally conducted studies, and the fact that the BPH is aware of these
20 studies, showing that 3-6 in 10,000 re-offend is totally opposite to the Board's
21 findings that nearly 99 percent or more, are an unreasonable risk or threat
22 to society, but, given the vast and virtually unlimited wisdom and presumed
23 psychological training and education of the Commissioners they know better than
24 the listed persons that conducted the studies aforementioned.

25                              **CONCLUSION**

26     There is no articulable evidence to support the Board's conclusion that
27 Petitioner still poses an unreasonable (current) risk to society if paroled.

28     Petitioner was entitled to a term setting under equal protection of the

                                    29

1   laws as asserted in his CLAIM NUMBER TWO, also, he was entitled to a term setting

2   at his first (initial) hearing, thus any denial was simply an increase in

3   punishment by the Board.

4       The Board's finding that Petitioner demonstrated a callous disregard for

5   human suffering and that his crime was cruel was "blind to the record", (In

6   re Scott, 119 Cal.App.4th at p.892), which shows no evidence of suffering above

7   that inherent in any death. The Board's assertion that the motive was "trivial"

8   is directly refuted by the Board's Matrix which identifies the circumstances

9   of this offense as being unexceptional and commonplace. The Board's finding

10  regarding "threat to society" is completely unsupported given Petitioner's more

11  that 12 years without any form of violence.

12      Petitioner has been diligently devoted to self-help improvement, and helping

13  others, while incarcerated, he has marketable skills and has realistic parole

14  plans. The record provides no reasonable grounds to reject, or even challenge,

15  the findings and conclusions of the psychologist concerning Petitioner's

16  dangerousnes. (In re Smith, 114 Cal.App.4th at pp.343, 369).

17      The Board's "predetermined conclusion in search of justification:, (In

18  re Caswell, (2001), 92 Cal.App.4th 1017, 1030), is amply demonstrated by its

19  findings that the crime was trivial. "It could not be both." (Scott, supra,

20  119 Cal.App.4th at p.892). This appears, by the Board, to be no more than a

21  reading of form/rote language without reference to Petitioner's case, apparently

22  to provide "a post hoc rationalization for a decision already made". (In re

23  Rosenkrantz, (2000), 80 Cal.App.4th at p.427).

24                  Respectfully submitted,

25

26                  William Ruiz

27                  William Ruiz

28

## DECLARATION

I, William Ruiz, declare under penalty of perjury that the foregoing is true and correct, executed this 25th day of June, 2007, at Soledad State Prison, Soledad, California.

William Ruiz

**PRAYER**

Wherefore, Petitioner respectfully requests that this Honorable Court declare/order that;

1). Penal Code §3041(a)(b) does create a protectable liberty interest at a parole suitability hearing for an expectant release date:

2). Respondents show cause why Petitioner is not entitled to the relief requested:

3). The BPH set a release date consistent with Petitioner's MEPD as is established in P.C. §3041(a):

4). The language in P.C. §3041(a) is the only true and constitutionally legal requirement for a parole release date consideration:

5). Petitioner be given a new parole suitability hearing that is fair, unbiased and meaningful under due process of law:

6). Petitioner's conviction must be proven to be "particularly egregious", under the standard of "special circumstances" before the BPH can apply subdivision (b) of P.C. §3041:

7). The BPH's conclusions are arbitrary and capricious against Petitioner:

8). That the Board set Petitioner's prison sentence (term), by the Matrix, as was done for Schiold, as is claimed by Petitioner:

9). That Petitioner be given an evidentiary hearing to establish how many other cases where the State set the term for other life prisoners and thus further violated the Fourteenth Amendment of the U.S. Constitution:

10). If the BPH does not set a parole release date for Petitioner, that this Honorable Court, under the U.S. Supreme Court's Constitutional grant of power, issue an order for Petitioner's release on parole forthwith:

11). Grant Petitioner such other relief as this Court deems just and proper in the interest of justice as Petitioner is a layman at law.

//

1  Willaim Ruiz. C-62255
   Box 689    C-312
2  California State Prison
   Soledad, CA 93960-0689

3
           Petitioner, in pro 'se
4

5
                    IN THE SUPERIOR COURT OF CALIFORNIA
6
                       FOR THE COUNTY OF TULARE
7

8  WILLIAM RUIZ,                    )    Case No. _____
                                    )
9           Petitioner,             )
                                    )
10  v.                              )    MOTION/REQUEST FOR JUDICIAL NOTICE
                                    )
11  CURRY, Warden,                  )
                                    )
12          Respondent.             )
                                    )
13  _____)

14

15  To: THE HONORABLE JUDGE(S) OF THE CALIFORNIA SUPERIOR COURT, FOR THE COUNTY
16  OF TULARE.

17      Pursuant to California Evidence Code sections 451 subdivision (a), 452
18  subdivision (a), (c) & (d), and 459 subdivision (a), Commode Home System, Inc.
19  v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and Adamson v. Zipp, (1984)
20  163 Cal.App.3d Supp. 1, n.17, Petitioner hereby asks this Court to take "Judicial
21  Notice" of the documents submitted and currently attached to the herein petition
22  as the following listed Exhibits: "A", Parole Board Suitability Hearing
23  Transcripts; "B", SETTLEMENT AGREEMENT OF SCHIOLD; "C", COURT ORDER Re:
24  ROSENKRANTZ; "D", PETITIONER'S PSYCHOLOGICAL EVALUATION REPORT.

25      This Court must take Judicial Notice of the factual findings of other
26  courts, and this Court's previous orders, even though the Court need not accept
27  the truth of those findings. See Mack v. State Bar of California, (2001) 92
28  Cal.App.4th 957, 961, rehearing denied, review denied; Duggal v. G.E. Capitol

                                    1

Communications Service, Inc., (2000) 81 Cal.App.4th 81, 82; <u>People v. Moore</u>, (1997) 59 Cal.App.4th 168, 178.

All of the attached cases arose out of habeas proceedings in the aforementioned courts. Review of the attached cases will assist this Court in evaluating the arguments presented in Petitioner's habeas corpus petition along with this Motion/Request For Judicial Notice.

Respectfully submitted,

William Ruiz

Dated: June 25th, 2007

2

# EXHIBIT

# A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

.

| In the matter of the Life | ) | |
|---|---|---|
| Term Parole Consideration | ) | CDC Number C-62255 |
| Hearing of: | ) | |
| | ) | |
| WILLIAM RUIZ | ) | |
| | ) | |

CALIFORNIA MEN'S COLONY

SAN LUIS OBISPO, CALIFORNIA

NOVEMBER 7, 2006

11:56 A.M.

PANEL PRESENT:

Ms. Bilenda Harris-Ritter, Presiding Commissioner
Mr. Louie DiNinni, Deputy Commissioner

OTHERS PRESENT:

Mr. William Ruiz, Inmate
Mr. Excel Sharrieff, Attorney for Inmate
Correctional Officer, Unidentified

**INMATE COPY**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | No | See Review of Hearing |
|---|---|---|
| _____ | | |
| _____ | Yes | Transcript Memorandum |

SUSAN R. SHABAZZ-PARRISH          Vine, McKinnon & Hall

ii

INDEX

Page

Proceedings...................................... 1

Case Factors.................................... 8

Pre-Commitment Factors..........................10

Post-Commitment Factors.........................20

Parole Plans....................................31

Closing Statements..............................41

Recess..........................................43

Decision........................................44

Adjournment.....................................48

Transcriber Certification.......................49

--oOo--

1

# P R O C E E D I N G S

1

2    **PRESIDING COMMISSIONER HARRIS-RITTER:**  We are on.

3    Good morning, again.  This is a Subsequent Parole

4    Consideration Hearing for William Ruiz, CDC number

5    C-62255.  Today's date is November 7th, 2006, and the

6    time is 11:56 a.m.  We are located at California Men's

7    Colony, San Luis Obispo.  The inmate was received on

8    March 11th, 1983 from Tulare County.  The life term began

9    on March 11th, 1983, and the Minimum Eligible Parole Date

10   is October 5th, 1993.  The controlling offense for which

11   the inmate has been committed is murder in the second

12   degree, case number TUL21376, count one, Penal Code

13   Section 187.  Mr. Ruiz, this Hearing is being tape

14   recorded, and for the purposes of voice identification we

15   are going to go around the room, each of us will say our

16   name and spell our last name, and when it is your turn,

17   if you could also please give us your CDC number, we

18   would really appreciate that, okay?

19       **INMATE RUIZ:**  Okay.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And I will

21   begin and will go to my right.  I am Bilenda Harris-

22   Ritter, H-A-R-R-I-S hyphen R-I-T-T-E-R, Commissioner,

23   Board of Parole Hearings.

24       **DEPUTY COMMISSIONER DININNI:**  Louie DiNinni,

25   D-I-N-I-N-N-I, Deputy Commissioner.

26       **INMATE RUIZ:**  William Ruiz -- Ruiz, R-U-I-Z,

27   William, W-I-L-L-I-A-M.

2

1    **DEPUTY COMMISSIONER DININNI:**  CDC number?

2    **INMATE RUIZ:**  C-62255.

3    **ATTORNEY SHARRIEFF:**  Excel Sharrieff, attorney for

4    Mr. Ruiz.

5    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

6    We also have a correctional peace officer in the room for

7    security purposes.  Now, Mr. Ruiz, under the documents

8    you brought in there is a paragraph taped to the table

9    related to Americans With Disabilities Act issues.  If

10   you could please read that into the record for us.

11   **INMATE RUIZ:**  ADA Statement.

12        "The Americans With Disabilities Act, ADA, is

13        a law to help people with disabilities.

14        Disabilities are problems that make it harder

15        for some people to see, hear, breathe, talk,

16        walk, learn, think, work, or take care of

17        themselves, than it is for others.  Nobody can

18        be kept out of public places or activities

19        because of a disability.  If you have a

20        disability, you have the right to ask for help

21        to get ready for your Board -- Board of Parole

22        Hearings, BPH Hearing, get to the hearing,

23        talk, read forms and papers, and understand

24        and -- the hearing process.  BPH will look at

25        what you ask for to make sure that you have a

26        disability that is covered by the ADA, and

27        that you have asked for the right kind of

3

```
1         help.  If you do not get help, or if you don't
2         think you got the kind of help you need, ask
3         for a BPH 1074 Grievance Form.  You can also
4         get help to fill it out."
5         PRESIDING COMMISSIONER HARRIS-RITTER:  Great --
6    thank you.  Now, I just need to ask you a few questions
7    that we ask everyone that is still related to ADA issues.
8    First, do you have any problem walking up or down stairs
9    or for distances of 100 yards or more?
10        INMATE RUIZ:  No.
11        PRESIDING COMMISSIONER HARRIS-RITTER:  And I note
12   that you are wearing glasses.  Are they sufficient for
13   you to see and read documents and participate in this
14   Hearing?
15        INMATE RUIZ:  Yes.
16        PRESIDING COMMISSIONER HARRIS-RITTER:  All right, do
17   you have any hearing impairments?
18        INMATE RUIZ:  No.
19        PRESIDING COMMISSIONER HARRIS-RITTER:  And have you
20   ever been included in the Triple CMS Program?
21        INMATE RUIZ:  Nope.
22        PRESIDING COMMISSIONER HARRIS-RITTER:  Have you ever
23   been included in the Enhanced Outpatient Program?
24        INMATE RUIZ:  No.
25        PRESIDING COMMISSIONER HARRIS-RITTER:  All right,
26   have you ever taken any psychotropic medication in prison
27   or on the streets?
```

4

1     **INMATE RUIZ:** Uh -- yes.

2     **PRESIDING COMMISSIONER HARRIS-RITTER:** Do you know

3 what the medication was?

4     **INMATE RUIZ:** It was -- uh -- Sinequan.

5     **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay, and do

6 you know approximately when you took it?

7     **INMATE RUIZ:** I think it was about '84 or '85.

8     **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay. All

9 right, thank you. And do you have any disability that

10 you believe would prevent you from participating in

11 today's Hearing?

12     **INMATE RUIZ:** No, I don't, Ma'am.

13     **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay, and I

14 do note that you signed a BPT Form 1073 on 6/29/06

15 indicating no disabilities, and that is still correct,

16 right?

17     **INMATE RUIZ:** Yes.

18     **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay, thank

19 you very much. The purpose of this Hearing is to

20 consider your suitability for parole. This Hearing is

21 being conducted pursuant to Penal Code Section 3041 and

22 3042 and the Rules and Regulations of the Board of Parole

23 Hearings governing Parole Consideration Hearings for life

24 inmates. In doing this, we will consider the number and

25 nature of the crimes for which you were committed, your

26 prior criminal and social history, your behavior and

27 programming since your commitment, and your plans if

5

1    released.  We will also consider your progress since your

2    commitment, your Counselor's Reports, and your Mental

3    Health Evaluation.· We have had the opportunity to review

4    your Central File, and you will have an opportunity to

5    correct or clarify the record.  We will focus on your

6    progress and any new reports since your last Hearing and

7    any change in Parole Plans since then should be brought

8    to our attention.  We will reach a Decision today and

9    inform you whether or not we find you suitable for parole

10    and tell you the reasons for our Decision.  If you are

11    found suitable for parole, the length of your confinement

12    will be explained to you.  Before we recess the Hearing

13    to deliberate on our Decision, the -- your attorney and

14    you will be given an opportunity to make a final

15    statement regarding your suitability.  We will then

16    recess, clear the room, and Commissioner DiNinni and I

17    will deliberate.  Once we have completed our

18    deliberations, we will resume the Hearing and will

19    announce the Decision.  The California Code of

20    Regulations states that regardless of time served, the

21    life inmate shall be found unsuitable for and denied

22    parole if in the judgment of the Panel the inmate would

23    pose an unreasonable risk or danger to society if

24    released from prison at this time.  Mr. Ruiz, you have

25    rights related to his Hearing which include a timely

26    notice of the Hearing, the right to review your Central

27    File, and the right to present relevant documents.  Mr.

6

1    Sharrieff, have your client's rights been met?

2        **ATTORNEY SHARRIEFF:**  Yes, they have.

3        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And you also

4    have a right to an impartial Panel.  Mr. Ruiz, do you

5    have any objection to the Panel?

6        **INMATE RUIZ:**  No.

7        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Counsel, do

8    you have any objections?

9        **ATTORNEY SHARRIEFF:**  No.

10       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

11   Mr. Ruiz, you will receive a copy of our written

12   Tentative Decision today.  That Decision becomes final in

13   120 days.  A copy of the Decision and a copy of the

14   transcript is going to be sent to you.  In 2004 the

15   regulations related to appeals changed.  So if you have

16   questions regarding an appeal of the Decision, you should

17   talk to your attorney or visit the Prison Law Library,

18   okay?

19       **INMATE RUIZ:**  Okay.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Good.  You

21   are not required to admit or discuss your commitment

22   offense.  However, the Panel does accept as true the

23   findings of the court.  Do you understand?

24       **INMATE RUIZ:**  Yes.

25       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

26   And Commissioner DiNinni, is there any confidential

27   material in the file and will it be used in this Hearing?

7

1      **DEPUTY COMMISSIONER DININNI:**  Yes, there is, but we

2   are not using it today.

3      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and I

4   did pass the -- Hearing Checklist to Mr. Sharrieff, and

5   you have indicated you have all of these documents.

6      **ATTORNEY SHARRIEFF:**  That is --

7      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

8   correct?

9      **ATTORNEY SHARRIEFF:**  -- correct, yes, Ma'am.

10      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Then we will

11   take that in as Exhibit One at this time.  And are there

12   any additional documents to be submitted?

13      **ATTORNEY SHARRIEFF:**  No.

14      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

15   are there any preliminary objections?

16      **ATTORNEY SHARRIEFF:**  No preliminary objections.  No

17   objections.

18      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And will Mr.

19   Ruiz be speaking with the Panel?

20      **ATTORNEY SHARRIEFF:**  Yes, however -- Mr. Ruiz will

21   not be discussing the commitment offense.  He will

22   stipulate to the facts as being true.

23      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

24   All right, Mr. Ruiz, if you could please raise your right

25   hand I will swear you in.  Do you solemnly swear or

26   affirm that the testimony you give at this hearing will

27   be the truth, the whole truth, and nothing but the truth?

8

1    **INMATE RUIZ:**  I do.

2    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And I

3    will go ahead and I will read into the record the facts

4    of the commitment offense.  I am going to read from the

5    October 2006 Calendar Board Report, page one, and --

6    yes -- just page one.  I will read the Summary of the

7    Crime and the Prisoner's Version.  According to the

8    Probation Officer's Report dated 3/4/83 and the

9    associated Sheriff's Office Report, the following

10   occurred:

11        "On November 7th -- excuse me -- 1982, Tulare

12        County Sheriff's Office dispatched officers to

13        the residence of Ezekiel Carranza,

14        C-A-R-R-A-N-Z-A, regarding a homicide.  Mr.

15        Carranza was having a baptismal party at his

16        home.  At approximately 3:25 a.m. a fight

17        occurred between Jessie Salazar and the

18        inmate.  According to the surviving victim,

19        Danny Oros, O-R-O-S, he and Jessie were

20        leaving the party when two men walked quickly

21        towards the Carranza residence.  One entered

22        the residence through the front door --

23        through the front door and William Ruiz walked

24        quickly towards Salazar.  Ruiz and Salazar

25        began fighting.  Danny Oros stepped between

26        the two men to stop the fight and Ruiz stated,

27        quote, "You too," and began striking Oros.

9

1    While fighting with Ruiz, Oros observed

2    Salazar stagger away then felt a couple of

3    rear blows to -- "to my back," end quote.

4    Ruiz then ran from the scene. Oros was then

5    told he was bleeding. Salazar was lying on

6    the ground dead. Cynthia Carranza, a female

7    witness, transported Oros to the Delano

8    Hospital."

9  Prisoner's Version:

10    "The reason I went to the house was to collect

11    money that was owed for drugs. When I arrived

12    at the house, I walked under the carport and

13    saw a guy wearing dark sunglasses. I noticed

14    he was the same man who caused my eye injury a

15    year ago. He was leaving the party and

16    noticed me under the carport. He started

17    walking toward me in a fast pace and reached

18    into his crotch area like he was reaching for

19    a weapon. I was in fear of my safety, so I

20    pulled my knife and stabbed him. I then

21    attempted to flee when someone grabbed me and

22    punched me in the face. I turned around and

23    all I could see were silhouettes of bodies. I

24    lashed out to the closest person to me and

25    apparently stabbed Oros in the back. I was

26    not trying to kill Jessie Salazar, and I am

27    sorry for what occurred."

10

1    This explanation remains the same as stated in the

2    previous Hearing.  Mr. Sharrieff, is there anything you

3    want to add or delete from the commitment offense facts?

4        **ATTORNEY SHARRIEFF:**  No.

5        **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

6    And -- and correct me if I am wrong, but I understand --

7    Mr. Ruiz -- will be discussing his prior criminal record.

8        **ATTORNEY SHARRIEFF:**  That is true.

9        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

10   correct?

11       **ATTORNEY SHARRIEFF:**  Yes.

12       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Mr.

13   Ruiz, I understand that you have a juvenile record.  Is

14   that correct?

15       **INMATE RUIZ:**  Yes.

16       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And my

17   records indicate that you were first arrested in 1976 at

18   the age of 15 for burglary and possession of marijuana.

19   Is that right?

20       **INMATE RUIZ:**  Yes.

21       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And at that

22   time you were made a Ward of the Court and given home

23   probation, and you had to pay $32.00 in restitution.

24       **INMATE RUIZ:**  Yes.

25       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

26   accurate?

27       **INMATE RUIZ:**  Yes.

11

1       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

2   And then in April of 1977, you were arrested by the

3   Tulare County Juvenile Court -- it says arrested by

4   Tulare County Juvenile Court for battery.  Is that

5   correct?

6       **INMATE RUIZ:**  Yes.

7       **PRESIDING COMMISSIONER HARRIS-RITTER:**  What was --

8   what happened in that situation?  What did you do?

9       **INMATE RUIZ:**  In 1977?

10      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Yes.

11      **INMATE RUIZ:**  My -- uh --

12      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you beat

13  up somebody?

14      **INMATE RUIZ:**  -- yes, I think I was in a fight

15  with -- uh -- somebody and injured the person.

16      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Then

17  later in 1977, you were arrested, and it was under the

18  Tulare County Juvenile Court for being under the

19  influence of a controlled substance and for the third

20  time you were given home probation.  Is that what you

21  recall?

22      **INMATE RUIZ:**  Yes.

23      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And what was

24  the controlled substance you were using?

25      **INMATE RUIZ:**  I believe it was -- uh -- marijuana.

26      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

27  then just a few months later in March 1978, you were

13

1      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you --

2      **INMATE RUIZ:**  I was trying to -- I was trying

3      to -- uh -- flee from them and he was trying to arrest me

4      and I started -- you know -- punching and kicking and --

5      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you

6      under the influence of any drug at that time?

7      **INMATE RUIZ:**  Yes, I was -- I had been -- uh --

8      drinking and smoking a little bit of marijuana at the

9      time.

10     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

11     then your adult convictions show that you were arrested

12     in November of 1980 for misdemeanor drunk driving on the

13     highway and obstructing and resisting a public officer.

14     And you got three years probation and 90 days jail.  Did

15     you serve all 90 days in jail?

16     **INMATE RUIZ:**  Yes.

17     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

18     then --

19     **INMATE RUIZ:**  Yes, I did.

20     **PRESIDING COMMISSIONER HARRIS-RITTER:**  -- all right.

21     And then here is where I need you to help me a little

22     bit.  If -- if in 1980 you got 90 days in jail, then it

23     says in July of 1982 you were arrested by Merced PD for

24     escape -- is that accurate?

25     **INMATE RUIZ:**  Yes.

26     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you in

27     the jail in Merced?

14

1    **INMATE RUIZ:**  Yes, I was in Merced County Jail

2    and -- uh -- I got transferred to the -- uh -- to the

3    camp -- to the road camp.  And that's where I had escaped

4    from.  And then -- uh -- about a year later, I was picked

5    up for this -- uh -- escape -- and I was sentenced to 90

6    days.

7    **PRESIDING COMMISSIONER HARRIS-RITTER:**  After they

8    caught you.

9    **INMATE RUIZ:**  Yes.

10    **PRESIDING COMMISSIONER HARRIS-RITTER:**  I see, okay.

11    But -- now correct me if I am wrong -- Visalia is not in

12    Merced County.

13    **INMATE RUIZ:**  That -- no.

14    **PRESIDING COMMISSIONER HARRIS-RITTER:**  So why were

15    you in Merced County Jail?

16    **INMATE RUIZ:**  For driving with suspended license.

17    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  All

18    right.  Anything else that I need to clarify related to

19    your criminal record?

20    **INMATE RUIZ:**  No, no, Ma'am.

21    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Thank

22    you.  Now, I understand you were born in Tulare,

23    California and you were one of four children to the

24    parents Frances and William Ruiz, right?

25    **INMATE RUIZ:**  Yes.

26    **PRESIDING COMMISSIONER HARRIS-RITTER:**  And your mom

27    lives in Roscoe now?

15

1        **INMATE RUIZ:**  Yes.

2        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And your dad,

3   he is deceased.  •

4        **INMATE RUIZ:**  Yes.

5        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And you have

6   got two brothers, one sister, and a half sister.

7        **INMATE RUIZ:**  Yes.

8        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And you were

9   living with your parents in Earlimart before you were

10  arrested on the commitment offense, right?

11       **INMATE RUIZ:**  Actually, I was living in -- uh --

12  Lamont, California --

13       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

14       **INMATE RUIZ:**  -- with my wife at the time.

15       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

16  and that was -- and who was your wife?  Linda Lemos?

17       **INMATE RUIZ:**  No -- uh -- Sandra Almata.

18       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Oh, okay.

19  And you married her in 1982, right?

20       **INMATE RUIZ:**  Yes.

21       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Now, before

22  we get into your adult social life, what was your life

23  like in your family while you were a kid growing up?  Was

24  there any alcohol use in the family?

25       **INMATE RUIZ:**  Um -- my -- my mother and father

26  were -- were divorced when I was very young.  I was an

27  infant at the time they were -- uh -- separated and then

16

1    later divorced.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

3    Did you live with your mom?

4          **INMATE RUIZ:**  Yes -- I did.

5          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And, what was

6    that like?

7          **INMATE RUIZ:**  Well, I'm the youngest of -- of the --

8    of the family -- and -- uh -- the closest in age to me is

9    five years.  My old -- my next to -- uh -- oldest brother

10   is -- his name is Richard -- and -- and they were like in

11   their -- in their -- you know -- 18 and I was like in

12   my -- you know ten years old or something.  And I was

13   basically alone at the house when I was growing up and I

14   used to just -- um -- just -- you know -- pretty much do

15   what I wanted -- because --

16         **PRESIDING COMMISSIONER HARRIS-RITTER:**  They didn't

17   want you tagging along with them?

18         **INMATE RUIZ:**  -- well, they were always busy working

19   and stuff -- you know -- to try to make ends meet at the

20   house.

21         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

22         **INMATE RUIZ:**  And my mom was always working, also.

23         **PRESIDING COMMISSIONER HARRIS-RITTER:**  So you were

24   left to figure out stuff on your own.

25         **INMATE RUIZ:**  Kind of -- yes -- yes.

26         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Was that hard

27   on you?

17

1    **INMATE RUIZ:**  Yes, it was.

2    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  When

3    did you start drinking alcohol?  How old were you?

4    **INMATE RUIZ:**  I was about -- I believe 11 or 12

5    years old.

6    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

7    what about using marijuana?  How old were you?

8    **INMATE RUIZ:**  I started about the same time.  About

9    12 years old.

10   **PRESIDING COMMISSIONER HARRIS-RITTER:**  And how did

11   you get it -- the alcohol and marijuana?

12   **INMATE RUIZ:**  Um -- older friends.

13   **PRESIDING COMMISSIONER HARRIS-RITTER:**  Do you need

14   some water?

15   **INMATE RUIZ:**  No, I'm all right.  Thank you.

16   **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

17   anybody else in your family using drugs and alcohol --

18   other siblings when they were under aged?

19   **INMATE RUIZ:**  Yes, my brother was at the time -- he

20   was underage.

21   **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Any

22   abuse in your family of any kind?

23   **INMATE RUIZ:**  Um -- I think my -- my -- I didn't see

24   it myself, but my -- I've heard stories that my dad used

25   to abuse my mom -- physically abuse her.

26   **PRESIDING COMMISSIONER HARRIS-RITTER:**  But you did

27   not see it -- because they -- he was gone, right?

18

1      **INMATE RUIZ:**  Yes.  And I was young at that time.

2      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Now,

3      this indicates that you dropped out of school in the 11th

4      grade?

5      **INMATE RUIZ:**  Yes.

6      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

7      right?

8      **INMATE RUIZ:**  Yes.

9      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Why did you

10     drop out of school?

11     **INMATE RUIZ:**  I was working and -- uh -- I felt at

12     the time that school could wait and -- uh -- it wasn't my

13     priority in life at the time.  I felt that -- that the

14     money was more important.

15     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay -- and

16     you and Sandra had your marriage annulled in 1984, right?

17     **INMATE RUIZ:**  Yes.

18     **PRESIDING COMMISSIONER HARRIS-RITTER:**  And no

19     children.  But you do have a daughter -- right?

20     **INMATE RUIZ:**  Yes.

21     **PRESIDING COMMISSIONER HARRIS-RITTER:**  With Linda

22     Lemos?

23     **INMATE RUIZ:**  Yes.

24     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Are you

25     ever -- do you have any contact with your daughter?

26     **INMATE RUIZ:**  Yes, all the time.

27     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

19

1  then after Sandra, you got married again, right?

2      **INMATE RUIZ:**  Yes.

3      **PRESIDING COMMISSIONER HARRIS-RITTER:**  To Nicole?

4      **INMATE RUIZ:**  Yes.

5      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And it's

6  Trasmaldenas?

7      **INMATE RUIZ:**  Yes.

8      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then that

9  ended in divorce, right?

10      **INMATE RUIZ:**  Yes.

11      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And you are

12  not married now, is that correct?

13      **INMATE RUIZ:**  No, I am not.

14      **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

15  And -- you have some vision loss in the left eye from the

16  incident where you knew that Jessie Salazar threw a

17  bottle at you while he was riding a motorcycle, right?

18      **INMATE RUIZ:**  Yes, I know -- I know --

19      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

20      **INMATE RUIZ:**  -- that he did, yes.

21      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, so he

22  did it.  And -- but you are still okay with your glasses

23  here today, right?

24      **INMATE RUIZ:**  Yes.

25      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Is

26  there anything else related to your social history that I

27  have not covered that you think is important to get into

20

1    the record -- from before you came to prison?

2         INMATE RUIZ:  No.

3         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

4         INMATE RUIZ:  No there is not.

5         PRESIDING COMMISSIONER HARRIS-RITTER:  Mr.

6    Sharrieff, anything you wanted to add?

7         ATTORNEY SHARRIEFF:  No, nothing else.

8         PRESIDING COMMISSIONER HARRIS-RITTER:  All right.

9    Then at this time I am going to turn the Hearing over to

10   Commissioner DiNinni who will go over the Post Conviction

11   Factors.  When he is finished with that it will come back

12   to me and we will talk about Parole Plans, okay?

13        INMATE RUIZ:  Okay.

14        DEPUTY COMMISSIONER DININNI:  Looks like your last

15   Hearing was October 3rd, of '05, and that was a

16   stipulated agreement that you are not suitable for a

17   period of one year, is that correct?

18        INMATE RUIZ:  No, that's not correct.  I had a

19   postponement due to a -- uh -- a new Psych Report in '05.

20        DEPUTY COMMISSIONER DININNI:  Okay, it says here

21   agreed unsuitable for one year.

22        PRESIDING COMMISSIONER HARRIS-RITTER:  Oh, that's

23   interesting.

24        DEPUTY COMMISSIONER DININNI:  And right next to it

25   is --

26        PRESIDING COMMISSIONER HARRIS-RITTER:  It was

27   postponed.

21

1      **DEPUTY COMMISSIONER DININNI:**  -- postponed.

2      **PRESIDING COMMISSIONER HARRIS-RITTER:**  It has -- it

3      has both.

4      **DEPUTY COMMISSIONER DININNI:**  Yeah, you did both.

5      That was interesting.  So the form is inaccurate.  Two to

6      one.  So there is two pages to the Postponement and one

7      to the --

8      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Agreed

9      unsuitable.

10     **DEPUTY COMMISSIONER DININNI:**  -- agreed unsuitable.

11     So -- all right -- it was postponed for a period of one

12     year for a new Psych and finish Bulk Dry Cleaning, right?

13     **INMATE RUIZ:**  Yes.

14     **DEPUTY COMMISSIONER DININNI:**  And so your last

15     Hearing was May 6th, of '04 -- that was a stipulated

16     agreement?

17     **INMATE RUIZ:**  Yes.

18     **DEPUTY COMMISSIONER DININNI:**  All right -- for a

19     period of one year.  I am looking for your last actual

20     Hearing.  It looks like your actual -- last actual

21     Hearing was February 14, of '02 wherein parole was denied

22     for a period of two years.  Is that correct?

23     **INMATE RUIZ:**  Yes.

24     **DEPUTY COMMISSIONER DININNI:**  Okay, very good.  And

25     there has been no transfers since your last Hearing or

26     those postponement -- stipulated agreement and

27     postponement, and it looks like there has been no

22

1    transfer since July 13th, of 2000, when you were received

2    here from High Desert?

3        INMATE RUIZ: Yes.

4        DEPUTY COMMISSIONER DININNI:  Okay.  And that was

5    not an adverse transfer.

6        INMATE RUIZ:  No, no it wasn't.  Correct.

7        DEPUTY COMMISSIONER DININNI:  Correct.  That is what

8    it says here.  The last Classification action noted and

9    received P-262 is April 4th of '06.  Indicates Medium A

10   Custody, Score 19, Vocational Dry Cleaning, and you are

11   still in Vocational Dry Cleaning only now you are not a

12   student you are a Teacher's Aid?

13       INMATE RUIZ:  Yes, that is correct.

14       DEPUTY COMMISSIONER DININNI:  Very good.  And your

15   812 was last updated March 29, '06.  Indicates no gang

16   and there is three non-confidential enemies noted.  And

17   looks like two are at Calipatria and one on parole -- Sol

18   Solarzano on parole in Region Three.  All right.  There

19   is a total of twelve 115's; the most recent one was

20   misuse of State property, June 21, of '02.  And also

21   twelve 128 A's; the most recent was August of '05 --

22   grooming standards.  You look clean shaven now -- all

23   right, very good.  And I noticed several laudatory

24   chronos.  I do not want to be redundant so let me see

25   what the counselor wrote.  I will go to Post Conviction

26   Factors -- authored by Jane Moreland, M-O-R-E-L-A-N-D,

27   CC-I, CMC's D-Quad, October 2006 Calendar.  The author

23

```
 1   writes:

 2        "Documents from previous Hearing have been

 3        considered and information remains valid.

 4        Ruiz remains housed at CMC, Level Three.  He

 5        had a Level Two override as he was pending BPH

 6        appearance.  After his last BPH Hearing he was

 7        in Door CSR Level Two override.  Vocation to

 8        complete Vocational Dry Cleaning Program, Ruiz

 9        education,"

10   Do you go by Reese or Ruiz?

11        INMATE RUIZ:  Ruiz.

12        DEPUTY COMMISSIONER DININNI:

13        "Ruiz -- Education Progress Report dated

14        7/5/06 notes he is fully employable.  Ruiz

15        subsequent -- Ruiz was subsequently assigned

16        to position as Teacher's Assistant Vocational

17        Dry Cleaning.  Custody remains Medium A.  And

18        his Placement Score has been reduced from 26

19        mandatory minimum of 19 due to program

20        behavior.  Permanent mandatory minimum 19,

21        Level Two points due to violence."

22   And it says to note the Progress Report and Therapy and

23   Self-Help.  The counselor writes,

24        "Documents of previous Hearings reviewed.

25        Considered information remains valid since

26        last appearance.  He has continued volunteer

27        with Inmate Peer Education Program or IPEP.
```

24

1      He has taken training in Hepatitis, HIV, and

2      Sexually Transmitted Diseases.  In addition,

3      volunteers Saturday afternoons Recreational

4      Aid Program or RAP.  Ruiz helped provide

5      activities Psychiatric Inmates who are

6      assigned to assisted daily living program, D-

7      Quad.  Ruiz has been attending AA since April

8      12th of '02."

9  And he notes the disciplinary history.  Another counselor

10  writes:

11      "Appeared before BPH on 10/3/05 for a

12      Subsequent Parole Consideration Hearing.  He

13      stipulated unsuitability and the Board granted

14      his request for a One-Year Postponement.  So

15      that is -- there is the conflict -- this is

16      also in the narrative.  Ruiz is placed on

17      10/2006 Calendar.  The Board recommends --"

18  And we covered that:

19      "The Board requested an updated Psychological

20      Report and recommended Ruiz remain

21      disciplinary free.  Followed the Board's

22      recommendation.  Completed Vocational Dry

23      Cleaning.  Is employable in his trade.  He has

24      remained disciplinary free.  Involves

25      himself -- volunteers -- and makes --

26      volunteer activities and makes a positive

27      contribution to the inmate population and has

25

1    been acknowledged for his efforts."

2    And I note your certificate of completion for Vocational

3    Dry Cleaning that is dated July 18th, 2006.  Did you

4    complete any other vocations besides Vocational Dry

5    Cleaning?

6        **INMATE RUIZ:**  No, I had -- um -- received 216 hours

7    of -- uh -- Vocational Training in Small Engine Repair.

8    Due to the medical un-assignment of the instructor, I

9    wasn't able to get a completion, but I have received

10   70 -- 75% of the class, I have completed.

11       **DEPUTY COMMISSIONER DININNI:**  Very good.  And I note

12   your GED issued July 10th, '97.

13       **INMATE RUIZ:**  Uh -- I think it was 1985 or 4.

14       **DEPUTY COMMISSIONER DININNI:**  I see you took the

15   test January 24, of '84.

16       **INMATE RUIZ:**  Yeah, that's when I completed.

17       **DEPUTY COMMISSIONER DININNI:**  Okay.

18       **INMATE RUIZ:**  Actually.

19       **DEPUTY COMMISSIONER DININNI:**  Yeah, I see that --

20   the date of issue is July 10th, '97.  I do not know why

21   they would write that.  That is not very logical.  This

22   is better.  You have the High School Equivalency

23   Certificate and it is April 10th, '84.  So what happened

24   is maybe they requested the transcript and the date of

25   the transcript was July --

26       **INMATE RUIZ:**  yeah.

27       **DEPUTY COMMISSIONER DININNI:**  -- back in '97.

26

1        **INMATE RUIZ:**  That's what happened.

2        **DEPUTY COMMISSIONER DININNI:**  There you go.  Okay,

3  very good.  And let's see if there are any chronos I did

4  not speak to.  Assisted Living, I spoke to that and

5  updated September of '06.  And Mr. Foster Dry Cleaning

6  and for TAR noted hiring you as Teacher's Aid after you

7  completed.  And then prior to that -- your status that

8  you were doing well and you were going to complete the

9  course in 2006.  That is another chrono.  And this

10 10/20/05 laudatory and 10/11/05 for D. Chinn, C-H-I-N-N,

11 LCSW, indicating the Program for Sexually Transmitted

12 Diseases as noted in the document, and they would have

13 not been available at your last Hearing.  You got those

14 right after the last Hearing.

15       **INMATE RUIZ:**  Yes.

16       **DEPUTY COMMISSIONER DININNI:**  Okay, very good.  With

17 that I will go to the Psych Report.

18       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

19 And you will --

20       **DEPUTY COMMISSIONER DININNI:**  Yeah.

21       **PRESIDING COMMISSIONER HARRIS-RITTER:**  -- okay.

22       **DEPUTY COMMISSIONER DININNI:**  And that is authored

23 by Cynthia Glines, G-L-I-N-E-S, staff psychologist, dated

24 October 16th, of '06.  Under Risk for Violence the author

25 writes:

26        "Dr. Livingston used a semi-structured

27        interview and three objective instruments to

27

1    assess Mr. Ruiz' risk for future violence.

2    The Hare Psychopathy Checklist provides the

3    Historical Clinical Risk 20, or HCR 20, and

4    the Violence Risk Appraisal Guide or VRAG, on

5    each instrument the individual may be scored

6    as low, moderate, or high.  Taken together the

7    three weigh over 20 different factors that

8    have been found to contribute to the risk for

9    future violence.  The instruments focus

10   primarily on historical factors as the

11   research to date supports these as having the

12   best predictive value in determining risk for

13   future violence.  Dynamic Factors -- those

14   that have the potential to change are also

15   considered.  Given the instrument's reliance

16   on historical factors, someone with a history

17   such as Mr. Ruiz' will always present a higher

18   risk for future violence than a person in the

19   free community who has not engaged in violent

20   criminal behavior.  Dr. Livingston concluded

21   that the risk of recidivism on the violent

22   crime while in the free community was within

23   the moderate range.  Since that evaluation

24   there have been no significant changes that

25   would alter this finding.  Further, the

26   instruments were independently re-scored.  His

27   score on the Dynamic Factors which tends to

28

```
 1          reflect current level of functioning was

 2          within the low range.  However, because of his

 3          background, Mr. Ruiz' score on the historical

 4          items are such that his overall score will

 5          never be less than low moderate regardless of

 6          any positive programming he has done.

 7          Therefore, the risk for recidivism on a

 8          violent crime while in the free community

 9          remains within the low moderate to moderate

10          range."
```

11   Cynthia Glines, staff psychologist.  So I am not sure how

12   to take that.  Went from moderate to between low moderate

13   and moderate.

14          **INMATE RUIZ:**  Yes.

15          **DEPUTY COMMISSIONER DININNI:**  Is that your -- is

16   that your take on what is written here?

17          **ATTORNEY SHARRIEFF:**  Well, I think what Dr.

18   Glines -- uh -- attempted to do was to isolate -- uh --

19   the current situation as far as being low and comparing

20   that to the old Psych Report as well.  And so since most

21   of his historical factors are -- are constant and are

22   never going to change -- um -- she attempted to basically

23   isolate and show that anything for Mr. Ruiz will actually

24   be a low risk based upon his current situation.  However,

25   it is a moderate risk based upon his historical

26   situation.  That's how I interpret it to be.

27          **DEPUTY COMMISSIONER DININNI:**  Well, what I have is

29

1    the last one concluded moderate.  He will -- do to his

2    crime will never be below low moderate.  But she has in

3    between low moderate and moderate.  That is what I gather

4    from this conclusionary -- that is what I am reading

5    here.

6        **PRESIDING COMMISSIONER HARRIS-RITTER:**  I agree with

7    you.

8        **DEPUTY COMMISSIONER DININNI:**  Dr. Livingston

9    concluded moderate range.  Mr. Ruiz' score -- historical

10   score will never be less than low moderate.  Right.  And

11   therefore the risk recidivism under violent crime while

12   in the free community remains within the low moderate to

13   moderate range.  So it could be low moderate.  But she

14   has in between the two.  That is my understanding of this

15   report.  Okay, anything we missed as far as programming

16   from the time you came to prison?  We got your GED.  We

17   got Vocational Dry Cleaning.  You were doing real well in

18   Machine Shop -- Machine Shop or Small Engine Repair, sir?

19       **INMATE RUIZ:**  Small Engine Repair.

20       **DEPUTY COMMISSIONER DININNI:**  Okay, but the

21   instructor took ill.

22       **INMATE RUIZ:**  Now and the -- yes -- in -- in the --

23       **DEPUTY COMMISSIONER DININNI:**  Yes.

24       **INMATE RUIZ:**  -- Small Engine.

25       **DEPUTY COMMISSIONER DININNI:**  That is the only

26   reason you did not complete that.

27       **INMATE RUIZ:**  Yes.

30

1    **DEPUTY COMMISSIONER DININNI:**  You were doing well in

2    that.

3    **INMATE RUIZ:** .Yes, Sir.

4    **DEPUTY COMMISSIONER DININNI:**  Now --

5    **INMATE RUIZ:**  And that was in High Desert then I was

6    transferred from that facility.

7    **DEPUTY COMMISSIONER DININNI:**  Okay.  And then the

8    last go round requested to finish program and get a new

9    Psych.  And did finish the program and got a new Psych.

10    **INMATE RUIZ:**  Yes.

11    **DEPUTY COMMISSIONER DININNI:**  Anything to add on

12    Post Conviction Factors?  Either --

13    **INMATE RUIZ:**  Well -- I also attended -- uh -- I

14    attend -- uh -- AA -- uh --

15    **DEPUTY COMMISSIONER DININNI:**  That is noted by the

16    Counselor and I noted the chronos.

17    **INMATE RUIZ:**  Okay.

18    **DEPUTY COMMISSIONER DININNI:**  And -- also other

19    programs that you completed prior to your last Hearing.

20    **INMATE RUIZ:**  Yes.

21    **DEPUTY COMMISSIONER DININNI:**  Are also noted with

22    the certificates that are in here.  I am looking for the

23    most recent.  They tend to take a while to get in here.

24    Got the RAP, that was noted in the narrative.  Dated July

25    of '05.  And I do not see a recent -- that March of '05

26    is the last any -- also -- and that was 25th, and March

27    4th is the last AA I have in here.  But you are still

31

1    continuing in the program.

2        **INMATE RUIZ:** Yes.

3        **DEPUTY COMMISSIONER DININNI:** Okay. Do you have

4    more recent ones that did not get in here?

5        **INMATE RUIZ:** No, I don't --

6        **DEPUTY COMMISSIONER DININNI:** Okay.

7        **INMATE RUIZ:** -- no I don't, at this time.

8        **DEPUTY COMMISSIONER DININNI:** Okay, those are noted

9    here. Okay, with that I will -- anything, counsel?

10       **ATTORNEY SHARRIEFF:** Nothing else.

11       **DEPUTY COMMISSIONER DININNI:** I will return you to

12   the Chair.

13       **PRESIDING COMMISSIONER HARRIS-RITTER:** Thank you.

14   All right Mr. Ruiz, let's talk a little bit about your

15   Parole Plans. I do have a number of support letters in      ✓

16   there. I would like to go through those first, and if I

17   leave out anybody -- please try and help me get that into

18   the record as well.

19       **INMATE RUIZ:** Okay.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:** I have -- the   ✓

21   first one I have is Collie -- is it Consias?

22       **INMATE RUIZ:** Yes.

23       **PRESIDING COMMISSIONER HARRIS-RITTER:** And she is an

24   aunt -- is that correct?

25       **INMATE RUIZ:** Yes, that's correct.

26       **PRESIDING COMMISSIONER HARRIS-RITTER:** We have a

27   letter from her dated September 24th, 2006. And she

32

1    supports parole.  And then Stella Pasquale -- is that it?

2        INMATE RUIZ:  Yes.

3        PRESIDING COMMISSIONER HARRIS-RITTER:  And that one

4    is undated, but -- and she is a cousin and she also

5    supports your parole.

6        INMATE RUIZ:  Yes, she does.

7        PRESIDING COMMISSIONER HARRIS-RITTER:  Then Margaret

8    Ruiz, your sister.

9        INMATE RUIZ:  Yes.

10        PRESIDING COMMISSIONER HARRIS-RITTER:  Dated

11    9/24/06.  And she supports you and she also supports --

12    let me clarify this -- does she have a -- a job she --

13    she is willing -- she has someone that is willing to work

14    and they train the employee and he will be able to work

15    in this -- or her husband's company.  Is that right?

16        INMATE RUIZ:  Yes, it is.

17        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, so that

18    is an -- a -- an employment offer.

19        INMATE RUIZ:  Right.

20        PRESIDING COMMISSIONER HARRIS-RITTER:  And then Joel

21    Cordova?  Is it Cordova?

22        INMATE RUIZ:  Cardona.

23        PRESIDING COMMISSIONER HARRIS-RITTER:  Cordone --

24    Cardona.  Okay.  And that letter is from September 7th,

25    '06.  And who is Cardona?  That is aunt and uncle, right?

26        INMATE RUIZ:  Yes.

27        PRESIDING COMMISSIONER HARRIS-RITTER:  And they

33

1    are -- they would offer you a residence and financial

2    support.

3        **INMATE RUIZ**: . Yes.

4        **PRESIDING COMMISSIONER HARRIS-RITTER**:  And where do

5    they live?

6        **INMATE RUIZ**:  They live in Earlimart.

7        **PRESIDING COMMISSIONER HARRIS-RITTER**:  Okay.

8        **INMATE RUIZ**:  California.

9        **PRESIDING COMMISSIONER HARRIS-RITTER**:  And then --

10    Delia Cardona -- is it Oguin?

11        **INMATE RUIZ**:  Oguen.

12        **PRESIDING COMMISSIONER HARRIS-RITTER**:  Okay, sister.

13        **INMATE RUIZ**:  Yes.

14        **PRESIDING COMMISSIONER HARRIS-RITTER**:  She also

15    offers you a residence and financial support, right?

16        **INMATE RUIZ**:  Yes.

17        **PRESIDING COMMISSIONER HARRIS-RITTER**:  And does she

18    also live in Earlimart?

19        **INMATE RUIZ**:  No, she lives in Wasco, California.

20        **PRESIDING COMMISSIONER HARRIS-RITTER**:  Okay.  And

21    then -- July 31st, 2006, a letter from Monica Santos,

22    your niece.  And she offers a residence.  And is she in

23    Shafter?

24        **INMATE RUIZ**:  Yes, she lives in Shafter.

25        **PRESIDING COMMISSIONER HARRIS-RITTER**:  Okay, and

26    then Robert Ornellas has written August 1st, 2006 -- and

27    he has an employment offer in Home Improvement -- is that

34

1    right?

2         **INMATE RUIZ:**  Yes.

3         **PRESIDING COMMISSIONER HARRIS-RITTER:**  And he

4    indicated he is a rehabilitated drug addict -- is that

5    right?

6         **INMATE RUIZ:**  Yes, he is.

7         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you meet

8    him here?

9         **INMATE RUIZ:**  No, that's my nephew.

10        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Oh, okay.  I

11   did not have that marked down.  All right, October 13th,

12   2005 -- Monica Santos, that is a duplicate letter.  And

13   Linda Sombrano --

14        **INMATE RUIZ:**  Yes.

15        **PRESIDING COMMISSIONER HARRIS-RITTER:**  -- and that's

16   the mother of your daughter, right?

17        **INMATE RUIZ:**  Yes, she is.

18        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And 9/15/05

19   she wrote a letter to the Board.

20        **INMATE RUIZ:**  Yes.

21        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then

22   Jessica Ruiz, that is your daughter.

23        **INMATE RUIZ:**  Yes.

24        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And she wrote

25   a letter August 17th, '05 also in support of parole.  And

26   then there is a letter from Francesca -- is it Arriaga?

27        **INMATE RUIZ:**  Yes.

35

1       **PRESIDING COMMISSIONER HARRIS-RITTER:**  May 5th, '05.

2   And he will interview you for a job.

3       **INMATE RUIZ:** . Yes.

4       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Right?  Okay.

5   And then there is a letter from your mother -- and I

6   think that is from -- is that from '04 -- let me look at

7   it.  It is -- I think an older letter.  But I thought it

8   was your mom, Felicia.  No -- March 1st, '05.  Okay --

9   now is there any that I missed that are current letters?

10      **INMATE RUIZ:**  Uh -- no -- I believe --

11      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Seems like

12  everything?

13      **INMATE RUIZ:**  -- you covered it.  Covered it all.

14      **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right, so

15  what is your particular plan as far as where you would

16  live and what employment you would pursue?

17      **INMATE RUIZ:**  I would live with my sister, Delia

18  Orne -- uh -- Oguen.

19      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  All

20  right.

21      **INMATE RUIZ:**  And employment would be with -- uh --

22  my nephew, Robert Ornellas.

23      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

24  what would you be doing with him?

25      **INMATE RUIZ:**  I would be -- uh -- refurbishing

26  like -- um -- either like hotels, restrooms, -- uh --

27  kitchens, sidewalks, basic construction.

36

1  **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And

2  Delia lives where again?

3  **INMATE RUIZ:** ·In -- in Wasco.

4  **PRESIDING COMMISSIONER HARRIS-RITTER:**  That is

5  right.  In Wasco.  And is that where Robert's company is

6  located?

7  **INMATE RUIZ:**  His company is in McFarland, which is

8  about 10 minutes away.

9  **PRESIDING COMMISSIONER HARRIS-RITTER:**  Yes, it is

10  not very far.  And plus, you would need to be going

11  wherever the jobs were anyway -- right?

12  **INMATE RUIZ:**  Yes.  Yes, I would.

13  **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  And do

14  you have any plans regarding any -- substance abuse self-

15  help?

16  **INMATE RUIZ:**  Yes, I -- I have -- uh -- wrote --

17  uh -- the -- the AA -- uh -- Office -- Central Office

18  in -- uh -- in Bakersfield, California.

19  **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

20  **INMATE RUIZ:**  And they sent me a brochure with all

21  the -- uh -- local -- uh -- NA's and AA's in the area --

22  in the immediate area.  And -- uh -- and I wrote letters

23  to these addresses, but the letters were returned to me.

24  I have the -- the letters here that were returned to me.

25  **PRESIDING COMMISSIONER HARRIS-RITTER:** ·Oh. ⁻

26  **INMATE RUIZ:**  But I just have the one brochure that

27  was sent to me from the Central Office.

37

1      **PRESIDING COMMISSIONER HARRIS-RITTER:**   Okay.

2      **INMATE RUIZ:**   So.

3      **PRESIDING COMMISSIONER HARRIS-RITTER:**   All right,

4      anything else you want to add that I did not cover

5      regarding the Parole Plans?

6      **INMATE RUIZ:**   No, no, no I don't.

7      **PRESIDING COMMISSIONER HARRIS-RITTER:**   All right.

8      Then -- let me note -- we will move on and let me note

9      for the record that we did send out the 3042 Notices.

10     Those are notices that go to agencies that have a direct

11     interest in your case.  And as a result of that Notice we

12     did receive a letter from the District Attorney's Office.

13     In fact, we have two; one old from '04, but this one is

14     October 18th, 2006.  And I will note they indicated that

15     the Tulare County District Attorney's Office will not be

16     sending a representative to attend the Parole Hearing,

17     but they ask us to consider this letter and urge us to

18     deny parole at this time.  It is signed by Carol B.

19     Turner, Assistant District Attorney.  And she indicates

20     that:

21          "The murder committed by Inmate Ruiz was cruel

22          and unpredictable.  And although Inmate Ruiz

23          is active in volunteering with the Inmate Peer

24          Education Group, he is not active with the

25          programs that can truly benefit him the most.

26          Inmate Ruiz murdered someone because of drugs.

27          He should be consistently attending AA and NA

38

1      meetings.  Most importantly, Inmate Ruiz

2      continues to make poor decisions while

3      incarcerated..  Therefore, the People ask that

4      Inmate Ruiz be denied parole at this time."

5 Now, it is my understanding that you were attending AA --

6 is that correct --

7      **INMATE RUIZ:**  Yes.

8      **PRESIDING COMMISSIONER HARRIS-RITTER:**  -- that you

9 have participated in NA also?

10      **INMATE RUIZ:**  Yes.

11      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And how long

12 have you been consistently active in AA?

13      **INMATE RUIZ:**  I would say -- uh -- at least 15

14 years.

15      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

16 when we say consistently active -- how often do you go to

17 meetings?

18      **INMATE RUIZ:**  Uh -- here at this facility -- each

19 facility varies.

20      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Right --

21      **INMATE RUIZ:**  At this --

22      **PRESIDING COMMISSIONER HARRIS-RITTER:**  -- I

23 understand that.

24      **INMATE RUIZ:**  -- fac -- at this facility it's every

25 two weeks.

26      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

27      **INMATE RUIZ:**  So every other week.

39

1    **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

2    And what about NA?

3    **INMATE RUIZ:**  NA -- I was -- I was attending and I

4    was placed on an inactive list -- uh -- because of my --

5    my job at that time.  And -- uh -- I am currently on the

6    active waiting list to be re-docketed.  It was -- I think

7    it was like a mix up.

8    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

9    **INMATE RUIZ:**  So.

10    **PRESIDING COMMISSIONER HARRIS-RITTER:**  And you have

11    a sponsor for AA -- is that correct?

12    **INMATE RUIZ:**  Yes, I do.

13    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is your

14    sponsor here or on the street?

15    **INMATE RUIZ:**  He's here.

16    **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

17    And you are working the steps, right?

18    **INMATE RUIZ:**  Yes, I am.

19    **PRESIDING COMMISSIONER HARRIS-RITTER:**  I think I

20    read in there that you are re-working some of them, but

21    you are up to about step six?

22    **INMATE RUIZ:**  Yes.

23    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

24    correct?

25    **INMATE RUIZ:**  Yes, that is correct.

26    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, then at

27    this time you move into the portion of the Hearing where

40

1   we can ask questions.  So I am going to ask Commissioner

2   DiNinni if he has any questions he would like to ask you

3   at this time.      .

4       **DEPUTY COMMISSIONER DININNI:**  What were you on

5   probation for at CYA?

6       **INMATE RUIZ:**  Uh -- at CYA -- I think -- uh --

7   battery on a police officer.

8       **DEPUTY COMMISSIONER DININNI:**  That is the one that

9   was discussed earlier.  That was the first -- the parole?

10      **INMATE RUIZ:**  Yes.  Yes.

11      **DEPUTY COMMISSIONER DININNI:**  You were on parole for

12  that.

13      **INMATE RUIZ:**  Yes.

14      **DEPUTY COMMISSIONER DININNI:**  Okay, and summary

15  probation -- what was that for?

16      **INMATE RUIZ:**  Um --

17      **DEPUTY COMMISSIONER DININNI:**  At the time of the

18  incident offense.

19      **INMATE RUIZ:**  -- I think for the drunk driving.

20      **DEPUTY COMMISSIONER DININNI:**  Okay.  The one at East

21  Tulare, or --

22      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Or Merced?

23      **DEPUTY COMMISSIONER DININNI:**  -- Visalia or Merced,

24  okay, all right, that's all I need.

25      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

26      **DEPUTY COMMISSIONER DININNI:**  Thank you.

27      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Mr.

41

1    Sharrieff, do you have any questions?

2        **ATTORNEY SHARRIEFF:**  No questions.

3        **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

4    then we will move to Final Statements.  So Mr. Sharrieff,

5    we will hear from you first.

6        **ATTORNEY SHARRIEFF:**  Thank you.  I do believe that

7    Mr. Ruiz should be found suitable for parole this

8    afternoon.  If we look at his actual Parole Plans and

9    also his programming while incarcerated, he does have

10   excellent Parole Plans.  They are very realistic.  He

11   does plan to live in Wasco, and he has a job offer

12   waiting for him as Home Improvement Specialist.  He had

13   remarkable skills prior to being incarcerated.  He is a

14   small engine repair while -- while incarcerated.  He has

15   Landscaping, Forklift Operator.  He maintained employment

16   while not being in custody on the street.  He does have

17   active NA and AA which is notation in the past.  He goes

18   to AA on Fridays from 6 p.m. to 8:15, and so he is

19   definitely active in his AA program, and also in working

20   his steps as well.  He does have a vocation that has been

21   completed.  That is his Dry Cleaning.  That was completed

22   July 18th, of this year.  He does have a Grade A, as far

23   as his assignments with Dry Cleaning.  He did upgrade

24   academically as far as receiving a GED.  He has positive

25   chronos.  He has been a volunteer as well, and also

26   Inmate Peer Program, and assisting with the program, and

27   also assisting others with STD's information as well.  He

42

1  has strong family support and also family ties.  His
2  family visits him often.  And he also writes letters to
3  them as well.  I do believe that Mr. Ruiz is ready to be
4  paroled.  All his plans are in order.  He has the skills
5  necessary.  If the Board finds Mr. Ruiz not suitable, I
6  do believe within one year Mr. Ruiz can come back and
7  actually fix any plans that need to be fixed.  Or a
8  Psychological Assessment can be redone.  Because I do see
9  for mis -- Dr. Glines' report -- that -- the fact that
10  she stated it was low to moderate, to moderate range to
11  me is a little ambiguous.  I don't know whether or not
12  Mr. Ruiz is tending towards the low moderate, or whether
13  or not he is moderate.  I have no idea.  I do believe
14  that this should be cleared up, because Mr. Ruiz, based
15  upon this report and also the Addendum, on some of his
16  historical factors as noted earlier, is going to be
17  constant.  And the question I have is, whether or not
18  miss -- miss -- Dr. Glines is stating that his function
19  level currently is low and his functioning as far as
20  historically is high.  What will be his functioning or
21  his risk assessment for future violence, currently.  Will
22  it be in that mid-range, or will it be actually low to
23  moderate.  And I think this needs to be cleared up, if we
24  do not receive a date this afternoon -- and I will
25  submit.

26      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.
27  Mr. Ruiz, would you like to make a Final Statement?

43

1        INMATE RUIZ:  That's -- that's it.  I'm -- I'm all

2    right.

3        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, he did

4    a good job for you.

5        INMATE RUIZ:  Yes, he did.

6        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

7        INMATE RUIZ:  Yes.

8        PRESIDING COMMISSIONER HARRIS-RITTER:  All right, we

9    are going to recess for deliberations.  The time is

10    12:35.

11                        R E C E S S

12                        --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

44

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER DININNI:**  We are on the record.

4    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

5    Everyone previously noted as present is still present.

6    And the time is 1:12 p.m.  In the matter of Inmate

7    William Ruiz, the Panel has reached a Decision.  Mr.

8    Ruiz, the Panel reviewed all information received from

9    the public and relied on the following circumstances in

10   concluding that the prisoner is not suitable for parole

11   at this time and would pose an unreasonable risk of

12   danger to society or a threat to public safety if

13   released from prison.  We will do a One-Year Denial.  And

14   I will go over the reasons for that.  Okay, thank you.

15   First of all, the offense was carried out in an

16   especially cruel manner.  The offense was carried out in

17   a manner which demonstrates an exceptionally callous

18   disregard for human suffering -- and the motive for the

19   crime was inexplicable and trivial in relation to the

20   offense.  These conclusions are drawn from the Statement

21   of Facts that were reported from the Board Report of the

22   October 2006 Board Report and which I now incorporate by

23   reference.  I note that the victim, Salazar, suffered six

24   knife wounds.  Two in the victim's left forearm.  One in

25   the left shoulder.  One beneath the left eye.  One at the

26   base of the left side of the victim's neck.  And the

27   **WILLIAM RUIZ   C-62255   DECISION PAGE 1   11/7/06**

45

1    fatal wound was at the juncture of the collarbone and the

2    sternum which severed a large artery and caused the

3    victim to bleed to death into his chest.  The prisoner

4    has on previous occasions inflicted or attempted to

5    inflict serious injury on a victim.  He has a record of

6    violence or assaultive behavior and an escalating pattern

7    of criminal conduct or violence and has failed previous

8    grants of probation and parole and can not be counted

9    upon to avoid criminality.  Failed to profit from

10   society's previous attempts to correct his criminality.

11   Such attempts include juvenile probation, a CYA parole,

12   CYA commitment, and county jail.  And an unstable social

13   history and prior criminality which includes battery on a

14   peace officer, obstructing and resisting a public

15   officer, an escape from work camp in Merced County.  In

16   addition to being involved in drugs.  The prisoner has

17   not sufficiently participated in beneficial self-help

18   related to alcohol abuse.  And has failed to demonstrate

19   enough evidence through positive change at this time.

20   Misconduct while incarcerated includes 128 A counseling

21   chronos; the last of which was August 5th, for grooming

22   standards, and two serious 115 disciplinary reports in

23   2002; one for misuse of State property, and one that was

24   related to the abuse of alcohol, which is the one that

25   concerns us the most at this time.  The Psychological

26   Report dated October 16th, 2006, and authored by Dr.

27   **WILLIAM RUIZ   C-62255   DECISION PAGE 2   11/7/06**

46

1    Cynthia Glines, we believe is inconclusive in that the

2    risk for violence assessment is ambiguous as your

3    attorney argued.  We do agree with your argument on that,

4    and believe that it is necessary to have a new Psych

5    Report to clarify that situation.  Your Parole Plans look

6    good.  We do not have any quarrel with what you are

7    looking to for your future plans.  We note that responses

8    to Penal Code Section 3042 Notices indicate opposition to

9    a finding of parole suitability, specifically the

10   District Attorney of Tulare County.  Other information

11   bearing on suitability, other factors include past mental

12   state, past and present attitude toward the crime, signs

13   of remorse, involvement in other criminal misconduct,

14   which is reliably documented and any other relevant

15   reliable information or circumstances which taken alone

16   may not firmly establish unsuitability, but which when

17   taken together contribute to a pattern which results in

18   unsuitability.  And again, we have a concern regarding

19   the 115 for alcohol in 2002, considering the role of

20   alcohol and drugs in the commitment offense.  And we

21   believe additional self-help is needed in that particular

22   area.  The Panel makes the following findings:  the

23   prisoner needs additional self-help in order to face,

24   discuss, understand, and cope with stress in a

25   nondestructive manner, and until additional progress is

26   made the prisoner continues to be unpredictable and a

27   **WILLIAM RUIZ    C-62255    DECISION PAGE 3    11/7/06**

47

1    threat to others.  The prisoner's gains as to abstinence

2    from alcohol are recent, and he must demonstrate an

3    ability to maintain gains over an extended period of

4    time.  Nonetheless, the prisoner should be commended for

5    completion of Vocational Dry Cleaning, positive chronos

6    in the Recreational Aid program for providing activities

7    for the psychiatrically impaired inmates housed in the

8    Assistance for Daily Living Program, and participation in

9    the Inmate Peer Education Program.  However, these

10    positive aspects of his behavior do not outweigh the

11    factors of unsuitability at this particular time.  It is

12    a One-Year Denial, so we do not have a separate Decision,

13    but we have recommendations, which include that you

14    remain disciplinary free, and be able to participate

15    further in self-help and cooperate with clinicians in the

16    completion of the new Psych Evaluation.  And we are going

17    to ask that the Psych Report specifically clarify the

18    ambiguity of Dr. Glines 10/16/06 Risk for Violence

19    Assessment as to the low moderate to moderate.  Mr. Ruiz,

20    that concludes the reading of the Decision.  Commissioner

21    DiNinni, do you have anything you would like to add?

22        **DEPUTY COMMISSIONER DININNI:**  Good luck.  Keep doing

23    what you are doing.  Get further away from that kind of

24    behavior like you got quite a ways away from the mutual

25    combat.  All that stuff is way behind you.  So, let's do

26    the same.  You are doing a good job.

27    **WILLIAM RUIZ    C-62255    DECISION PAGE 4    11/7/06**

48

1        **INMATE RUIZ:** All right, thank you.

2        **DEPUTY COMMISSIONER DININNI:** Good luck.

3        **INMATE RUIZ:** . Thank you.

4        **PRESIDING COMMISSIONER HARRIS-RITTER:** Thank you.

5    That concludes the Hearing. It is 1:16 p.m.

6    **(Adjournment)**

7                         --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:** ____MAR 0 7 2007____

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **WILLIAM RUIZ   C-62255   DECISION PAGE 5   11/7/06**

49

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SUSAN R. SHABAZZ-PARRISH, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 48, and which recording was duly recorded at CALIFORNIA MEN'S COLONY, at SAN LUIS OBISPO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of WILLIAM RUIZ, CDC No. C-62255, on NOVEMBER 7, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 10, 2006, at Sacramento County, California.

_Susan R. Shabazz-Parrish_
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
SUSAN R. SHABAZZ-PARRISH
Transcriber
**VINE, MCKINNON & HALL**

# E X H I B I T

# B

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re<br><br>**MIKAEL SCHIOLD,**<br><br>Petitioner-Appellee,<br><br>On Habeas Corpus. | A103107 |

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

## SETTLEMENT AGREEMENT AND FULL
## AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re | A103107 |
| MIKAEL SCHIOLD, | |
| Petitioner-Appellee, | |
| On Habeas Corpus. | |

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

"Releasor":  MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.    Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon.  Schiold's sentence is fifteen years to life plus one year.  Schiold is
identified by the Department of Corrections as inmate number D-31112.

2.    The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002.  On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

3.    Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.    Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.    This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.    Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.    Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.      Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.      Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.     Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.     In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them.  It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made.  Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

/// 

/// 

4

OCT-22-2003  16:41                                                    P.02

COPY

16.    Facsimile signatures shall bind the parties to this agreement.


Date: _10/22/03_

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold


Date: _10/22/03_

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

400094125.wpd

5

# E X H I B I T

# C

CONFORMED COPY
OF ORIGINAL FILED.
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk
By ⸺⸺⸺⸺⸺⸺⸺, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,                                    ) Case No.: BH003529
                                          ) ORDER RE: WRIT OF HABEAS CORPUS
ROBERT ROSENKRANTZ,                       )
                                          )
        Petitioner,                       )
                                          )
        On Habeas Corpus                  )
                                          )
                                          )
                                          )

        The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17,
2005, as well as the return and denial filed in response to the court's order to show cause.
Having independently reviewed the record, giving deference to the broad discretion of the Board
of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision
denying petitioner parole is not supported by "some evidence."

        Petitioner is currently serving a sentence of 15 years to life with a two-year firearm
enhancement following his 1986 conviction of second degree murder. Petitioner's minimum
eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the
argument that the Board violated its regulations and petitioner's right to due process by its
refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him
an unreasonable risk to public safety if paroled.

        On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner
parole, the Board relied upon the circumstances of the commitment offense. When determining

ep                                    1

1  unsuitability based on commitment offense, the Board may consider as a factor whether the

2  victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15,

3  § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of

4  times he was shot and the manner in which he was shot." In addition, the Board concluded that

5  the case "rises to the highest level of second-degree murder." The Board further stated in its

6  decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed

7  parole. While the Board is required to consider such opposition (see Penal Code section 3042),

8  that opposition is not a factor on which the Board may rely to deny parole as enumerated in title

9  15, section 2281 of the California Code of Regulations.

10      Towards the conclusion of the hearing, the Board summarily mentioned its concern that

11  petitioner is a danger to his brother, Joey. The court finds that this assertion is not only

12  unsupported by the record, but belied by the record, which contains documented evidence that

13  contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court

14  rejects the Board's inference that the absence of yearly supportive letters from petitioner's

15  brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and

16  traverse draws attention to a recent psychological evaluation addressing and dismissing the

17  Board's concern for the safety of petitioner's brother. However, because this psychological

18  evaluation was not evidence before the Board at the time of petitioner's hearing, the court may

19  not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there

20  is no evidence in the record that supports the conclusion that petitioner remains a danger to his

21  brother.

22      The Board's sole reliance on the gravity of the offense to justify denial of parole can be

23  initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir.

24  2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate

25  exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the

26  nature of the commitment offense raises serious questions involving his liberty interest in parole.

27  (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct

28  as well as his vocational and educational achievements over a period of many years. Indeed,

ep                                          2

1  petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2  may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3  (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4      The court finds that petitioner's continual parole denials have been based mainly on the

5  gravity of the commitment offense. the circumstances of which can never change. Therefore, the

6  Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7  original sentence of life with the possibility of parole into a sentence of life without the

8  possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9  crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11      Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep                                    3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2    granted.

3

4    June 26, 2006

5

6                                            DAVID S. WESLEY

7                                            Judge of the Superior Court

8    Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep                                    4

# EXHIBIT

# D




## MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PAROLE HEARINGS
## OCTOBER 2006 CALENDAR
## SUBSEQUENT HEARING #5
## CMC-EAST

### ADDENDUM

A comprehensive Mental Health Evaluation for Mr. Ruiz was completed by Dr. Livingston 12/18/2001 and updated 11/18/2003. This addendum will update those reports where relevant.

### IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Ruiz, William |
| CDCR Number: | C-62255 |
| DOB: | 11/09/1961 |
| Evaluation Date: | 10/02/2006 |
| Controlling Offense: | Murder 2nd degree, use of a knife |
| Non-controlling Offense: | Assault with a Deadly Weapon (knife) |
| Date of Offense: | 11/07/1982 |
| Sentence: | 15 years to Life |
| Date Received into CDCR: | 03/11/1983 |
| Date Arrived at CMC-East: | 05/09/1990 |

On 10/02/2006, Mr. Ruiz was presented with informed consent in both written and verbal form indicating the nature and purpose of the interview, his right to refuse the interview and the limits of confidentiality. He stated that he understood the content of the informed consent, agreed to the interview, and signed the consent form. He did not appear to need any auxiliary aids or other assistance to achieve effective communication.

Information for this evaluation was compiled from a semi-structured interview and a review of Mr. Ruiz's Central File and Unit Health Record.

The BPH asked for a new psychological evaluation, but no BPT 1000a was attached. Therefore, the following issues be addressed: the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes; the need for further therapy programs while incarcerated; and the prisoner's violence potential in the free community.

### CURRENT MENTAL STATUS

Mr. Ruiz showed up for his appointment on time and was cooperative to the assessment process. Hygiene was adequate and clothing was appropriate for weather conditions. He was oriented to person, place and date. Eye contact was within normal limits as were speech rate, rhythm, tone and volume. Thought process was logical, goal oriented, and reality based. He did not appear to be responding to internal stimuli. There were no indications of gross impairment or acute distress. Mr. Ruiz is not a recipient of mental health services. There was no evidence of a serious psychiatric or mood disorder at the time of the interview.



**MENTALHEALTH EVALUATION FOR THE BOARD OF PAROLE HEARINGS**          Page 2

Since his last evaluation, Mr. Ruiz has participated in the following self-help groups: Correctional Learning Network courses on Employment and Victim Awareness; N.A.; A.A.; Personal Growth Seminars videoseries Rites of Passage, Family Secrets, Life Skills, Anger Management. He also completed 46 months of process group with Dr. Tolchin.

Whether he remains incarcerated or is released to the community, it is recommended that Mr. Ruiz continue attending A.A. or similar self-help groups focused on substance abuse and related issues. He is a general population inmate and not eligible for individual or group therapy while incarcerated; therefore, there are no recommendations for therapy at this time. He is already participating in the self-help programs available to him.

## REVIEW OF LIFE CRIME

Mr. Ruiz recalled the events leading up to the crime, which were generally in agreement with those presented in previous mental health evaluations and thus will not be revisited here.

He was asked to discuss the underlying causes of the commitment offense. He said, "I believe the drugs and alcohol have everything to do with the crime itself. I was an irresponsible person. My choices at that time were wrong. Drugs and alcohol were a big part of my life at that time, but I didn't see it then. My thinking was, 'if he assaulted me a year prior, he would assault me again this evening.' My judgment made me assume this because the drugs had a lot to do with the way I was thinking and reacting. You have poor judgment under the influence of drugs and alcohol. If I'd been sober, I would have had a better thinking process, not so drastic. I prob'ly wouldn't have gone to that party in the first place. I would have known to stay away from Mr. Salazar and stay away from that environment because it was trouble. I made some wrong choices and used poor judgment. I shouldn't have armed myself. I never carried a gun, but did carry a knife sometimes for protection."

He continued, "My criminal lifestyle, the code of criminals, is not to rat out anybody. That night Mr. Salazar assaulted me and the authorities asked, 'what happened?' I told them I was in a motorcycle accident instead of telling them what actually happened. I prob'ly could have prevented this from happening if I said what had happened. As a criminal, I believed by selling drugs, I could support myself and my wife. I didn't have a job at the time. That thinking allowed me to carry a weapon, and involves having pride. Being part of the drug world and participating in that lifestyle, led me to commit the crime and brought nothing but pain and misery to my family and to Mr. Salazar's family and all parties involved. There is a mirage of drugs and money, but it brings nothing but negativity and it destroys people, families, and life. I see that now."

In summary, he thought substance abuse, being involved in a criminal lifestyle, and poor decision-making were the main underlying factors of the commitment offense.

He was asked what he had done to address these issues. "I've participated in self-help groups, trying to get a better understanding of myself, my thinking and my substance abuse problem. I'm still going through the 12-steps with a sponsor here. I'm maybe up to Step 6. I keep re-working some of the same steps. We have some serious talks and my sponsor enlightens me; we go back and forth. A.A. helps

MENTALHEALTH EVALUATION FOR THE BOARD OF PAROLE HEARINGS          Page 3

me everyday because I get up and do my serenity prayer and speak to my higher power to get me through the day. The Victim's Awareness course was helpful because it gave me some understanding of victims in general and helped me realize how I affected his family. I knew that already, but it gave me something new to think about. The whole chain reaction of a crime and how it affects someone and their family. The Anger Management course refreshed my memory from the Cat-T program when I took an anger management therapy group. It reminded me not to get my emotions and thoughts mixed up and not to let other people's attitudes effect my attitude. As far as poor-decision making and poor judgment, the talks with my sponsor have helped a lot. I used to go to Tolchin's process group once a week and we had good discussions on various subjects. He gave us a view of rational thinking to help us use it in our decision-making so we don't jump to conclusions or assume things, but to look at the facts and reality and don't pre-judge or assume something about a situation."

He described his relapse prevention plan. "I plan to get involved in A.A. and find a sponsor or have one waiting for me. I'll have a stable home and financial support and employment. I'll have family support. I won't use drugs or alcohol or be involved in any criminal activity." This is a reasonable plan.

Regarding his volunteer work, Mr. Ruiz said, "I enjoy the Recreation Aide Program. I come voluntarily on Saturdays to work with mental health inmates on D Quad … I've gotten to know them and they've gotten to know me over the 3 years I've been involved. I enjoy their non-judgmental attitude. It's a gift I receive from them just to be around them. It's the opposite of how I used to feel and think. Before, I might take advantage of someone who is mentally handicapped, but now I feel like protecting them and being responsible for them and not allowing any harm to come to them. Being responsible over a person like that and watching over them has made me realize I'm a changed person. I'm more mature, sincere, and responsible."

He added, "I'm very remorseful for taking Mr. Salazar's life. I feel bad about it. At the time, I was abusing drugs and I made bad choices. Those choices caused Mr. Salazar his life and brought a lot of pain to his family. I have to live with the choices I made for the rest of my life; but I'm not the same person I was 24 years ago. I've worked and made progress in my life. With all I've learned throughout my incarceration, I've become a better person with an understanding of myself."

Mr. Ruiz has not received a CDC-115 since June of 2002. His last CDC-128-A counseling chrono was in 2005 for grooming standards. His work supervisor reports have rated his work as exceptional. He completed the vocational dry cleaning course. He exhibits adequate levels of insight and remorse. However, it should be noted that the factors of insight and remorse are both already considered in the risk assessment, and should not be given greater weight when considering future dangerousness in the community. He received laudatory chronos for his work with the Inmate Peer Education Program, being an active member of the Recreation Aide Program, and for helping with the EOP holiday event in 2004. He upgraded his education skills with IPEP in 2005. Thus, the gains he has made can be considered adequate, at least within a structured environment.




MENTALHEALTH EVALUATION FOR THE BOARD OF PAROLE HEARINGS        Page 4

## RISK FOR VIOLENCE

Dr. Livingston used a semi-structured interview and three objective instruments to assess Mr. Ruiz's risk for future violence: the Hare Psychopathy Checklist – Revised; the Historical, Clinical, Risk – 20; and the Violence Risk Appraisal Guide. On each instrument an individual may be scored as low, moderate or high.

Taken together the three weigh over 20 different factors that have been found to contribute to the risk for future violence. The instruments focus primarily on historical factors, as the research to date supports these as having the best predictive value in determining risk for future violence. Dynamic factors (those that have the potential to change) are also considered. Given the instruments' reliance on historical factors, someone with a history such as Mr. Ruiz's will always present a higher risk for future violence than a person in the free community who has not engaged in violent criminal behavior.

Dr. Livingston concluded that the risk for recidivism on a violent crime while in the free community was within the moderate range. Since that evaluation, there have been no significant changes that would alter this finding. Further, the instruments were independently rescored. His score on the dynamic factors, which tends to reflect current level of functioning, was within the low range. However, because of his background, Mr. Ruiz's score on the historical items are such that his overall score will never be less than low-moderate, regardless of any positive programming he has done. Therefore, the risk for recidivism on a violent crime while in the free community remains within the low-moderate to moderate range.

Cynthia Glines, Psy.D., Staff Psychologist

Original:    Central File
cc:          Unit Health Record
             Inmate
             Psychology

RUIZ, William        C-62255        CMC-E        October 16, 2006

1

2

PROOF OF SERVICE BY MAIL

I, William Ruiz, declare that:

3

2I am over 18 years of age and that I am the pro per petitioner to the hereto attached cause of action. My complete mailing address is; William Ruiz, C-62255, Box 689  D-228U, California State Prison at Soledad, CA 93960-0689.

4

5

That I served a true and correct copy (original to the court) of the attached PETITION FOR WRIT OF HABEAS CORPUS, in sealed envelopes with postage fully prepaid and addressed to the following parties:

6

7

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

8

9

10

DECLARATION

11

I declare under penalty of perjury that the foregoing is true and correct, executed this 3ʳᵈ day of April , 2008 at Soledad, California.

12

13

14

William Ruiz

15

16

17

18

19

20

21

22

23

24

25

26

27

28